**EASTER SEAL SOCIETY FOR CRIP-PLED CHILDREN AND ADULTS OF LOUISIANA, INC. Plaintiff-Appellant**

v.

**PLAYBOY ENTERPRISES, et al., Defendants-Appellees.**

No. 85–3741.

United States Court of Appeals, Fifth Circuit.

April 23, 1987.

Rehearing and Rehearing En Banc Denied June 1, 1987.

Bradley M. Smolkin, James J. Popham, Fawer, Brian, Hardy & Zatzkis, New Orleans, La., for plaintiff-appellant.

Skye McLeod, Charles F. Thensted, Barham & Churchill, New Orleans for Greater New Orleans Educational Television (WYES–TV).

Liane C. King, A.R. Christovich, Jr., Christovich & Kearney, New Orleans, La., for Playboy Enterprises, Inc., et al.

Before GEE, POLITZ, and WILLIAMS, Circuit Judges.

GEE, Circuit Judge:

This case presents a new issue for our Court: What effect, if any, did the Copyright Act of 1976 have on the "work for hire" doctrine developed under the 1909 Act? We hold that 1976 Act has greatly restricted the scope of the "work for hire" doctrine, and we affirm the decision of the district court.

## A. Facts and Prior Proceedings

Entertainer Ronnie Kole, acting on behalf of the Easter Seal Society, contracted with the New Orleans public television station WYES for the videotaping of a staged "Mardi Gras-style" parade and a "Dixieland" musical jam session. WYES charged less than market rates as an indirect charitable contribution to the Society. The videotape was to be edited into a 16 minute segment for the National Easter Seal Telethon. There was no mention of copyrights.

On the day of production, Kole gave a number of layman's suggestions to WYES unit director John Beyer such as camera locations and particular scenes to look for during the fake "Mardi Gras" parade. Kole was "master of ceremonies" at the subsequent jam session performed by Kole and several well-known jazz musicians for the video crew. Kole told Beyer in advance about musical arrangements—the sequence and length of solos, for example—so that Beyer, who of course was taping in real time, could position his camera operators and tape appropriate shots of each band member. Kole also made suggestions about certain camera angles, but it is unclear to what extent Beyer followed them. Kole had no voice in deciding technical questions such as lighting, color balance, sound recording, and the like. Beyer fully supervised all unit employees, making the final aesthetic and technical decisions about the deployment of six video cameras and sound equipment. The taping proceeded smoothly in an atmosphere of exuberant music and amiable collaboration.

Beyer and his staff post-produced the final short segment (the "master" tape) from the raw video footage (the "field" tape), and it aired nationally in March 1982. WYES did not keep a copy of the master, but kept the field tape on file, using portions of it subsequently in several WYES-produced shows including a "Dixieland Jazz" series broadcast locally and distributed nationally.

Some time later, WYES director of broadcasting Julius Cain received a request from John Thompson, a Canadian television producer and acquaintance, for Mardi Gras parade footage. With no inkling of the intended use, Cain sent forty minutes of tape copied from the field tapes. Thompson or his associates used portions of the field tape in an "adult" film entitled "Can-

dy, the Stripper." "Candy" was created, produced, and distributed by various entities including named defendant Playboy, Inc.[1] It was shown nationally on cable television a total of four times during two days in May 1983. One or more viewers in the New Orleans area recognized themselves in the field footage now part of "Candy."[2] Counsel for the Society then demanded by letter that various defendants stop broadcasting "Candy" or an injunction would be sought "against the continued invasion of our clients' privacy as well as the continued breach of copyright." The contested footage was removed from "Candy" and no further copyright violations are alleged.

The Society sued in August 1983, alleging copyright infringement. After discovery, the parties submitted the issue to the district court on cross-motions for summary judgment. Both sides agreed that the relevant evidence was fully explored in the depositions of Kole and Beyer.

The district court granted partial summary judgment for the defendants, ruling that only the field tapes were involved in the alleged infringement. The court determined that Beyer was not an "employee" of the Society within the meaning of the "work for hire" doctrine of the Copyright Act of 1976, and that WYES held the copyright in the field tapes under the same doctrine. The Society appeals.

### B. "Work for Hire" under the 1909 Act

The Copyright Act of 1909 made an employer the "author" and initial copyright holder of "works made for hire." *See* 17 U.S.C. § 26 (1976). "Works made for hire" was undefined in the statute. Accordingly, a substantial body of cases developed as courts worked out the definition backwards in the usual manner of the common law. The obvious question implicit in the statute was whether independent contractors could be statutory "employees." That question remained unanswered for a surprisingly long time.

In the Second Circuit—the *de facto* Copyright Court of the United States—there was an early line of cases dealing with commissioned works by photographers.[3] The court developed a presumption that the parties intended the buyer to hold the copyrights in the photographs. In *Yardley v. Houghton Mifflin Co.*, 108 F.2d 28 (2d Cir.1939), *cert. denied*, 309 U.S. 686, 60 S.Ct. 891, 84 L.Ed. 1029 (1940), the court applied this presumption to a commissioned mural painted on a building. It stated the prior rule at a new level of generality:

> If [an artist] is solicited by a patron to execute a commission for pay, the presumption should be indulged that the patron desires to control the publication of copies and that the artist consents that he may, unless by the terms of the contract, express or implicit, the artist has reserved the copyright to himself.

108 F.2d at 31. These early cases presumed that the copyrights were *assigned* to the patron under the commission contract; there was nothing in them about "work for hire."[4] *Yardley* itself was inconsistent with the "works made for hire" clause of § 26. Under the 1909 Act, au-

---

1. Thus, this most delightful of case names: *Easter Seal Society for Crippled Children v. Playboy Enterprises;* seriously rivaled, in our judgment, only by *United States v. 11¼ Dozen Packages of Article Labeled in Part Mrs. Moffat's Shoo Fly Powders for Drunkenness*, 40 F.Supp. 208 (W.D.N.Y.1941) (condemnation proceeding under Food, Drug and Cosmetic Act), and *United States ex rel. Mayo v. Satan and his Staff*, 54 F.R.D. 282 (W.D.Pa.1971) (leave to proceed in forma pauperis denied in view of questions of personal jurisdiction over defendants).

2. In response to a question from the bench at oral argument, counsel for the Society related that one parade participant claimed she was a new cable TV subscriber who unknowingly turning to the Playboy Channel for the first time and soon saw herself on-screen. She apparently watched long enough to form a dislike for the context of the unexpected publicity.

3. *Cory v. Physical Culture Hotel*, 88 F.2d 411 (2d Cir.1937); *Lumiere v. Robertson-Cole Distributing Corp.*, 280 F. 550 (2d Cir.), *cert. denied*, 259 U.S. 583, 42 S.Ct. 586, 66 L.Ed. 1075 (1922); *Lumiere v. Pathe Exchange*, 275 F. 428 (2d Cir. 1921).

4. Throughout this opinion, we use the phrase "work for hire" interchangeably with the more awkward statutory phrase "works made for hire."

thors had rights different from assignees, including the right to renewal. If the *Yardley* court had deemed the mural a work "made for hire," the statutory employer (the patron) rather than the statutory employee (the artist) would have held the renewal rights as the statutory "author." Instead, the court explicitly assumed that the artist's executor rather than the patron had the right to renew the copyright in the mural. *Yardley*, 108 F.2d at 32. As late as 1955, the "presumed assignment" rule of *Yardley* was distinct from a more radical "presumption" that the commissioning party was the surrogate author under the "works made for hire" language of § 26. *See Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 221 F.2d 569, 570 (2d Cir.1955).

In *Brattleboro Publishing Co. v. Winmill Publishing Corp.*, 369 F.2d 565 (2d Cir.1966), the Second Circuit explicitly merged the *Yardley* rule into the "work for hire" doctrine for the first time.[5] Plaintiff newspaper sued defendant newspaper for using advertising copy that the plaintiff had prepared for merchants who later advertised in defendant's paper. The court recited a number of employer/employee cases and summarized them as creating the rule that the employer is the "author" "whenever an employee's work is produced at the instance and expense of his employer." *Brattleboro*, 369 F.2d at 567. Then came the critical twist: "We see no sound reason why these same principles are not applicable when the parties bear the relationship of employer and independent contractor." *Id.* at 568 (citing *Yardley*). The court held that there was no infringement because the merchants who paid for the ads were the "authors" under the "work for hire" doctrine. However, the court also discussed the unfairness to the newspaper's advertising customers of the contrary result, and Chief Judge Lumbard concurred solely on the ground that "probable intent" of the parties to a newspaper advertising contract was enough to sustain the judgment. *Id.* at 569. Thus, the relationship of the *Yardley* rule to the holding in *Brattleboro* was sufficiently ambiguous that the expansive language of the case could have been limited to its special facts.

But *Brattleboro* was not so limited. In *Picture Music, Inc. v. Bourne, Inc*, 457 F.2d 1213 (2d Cir.), *cert. denied*, 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972), the Second Circuit confronted a copyright claim by the assignee of a paradigmatic independent contractor.[6] The court affirmed the broad language of *Brattleboro* and the use of *Yardley* as a "work for hire" case.[7] Although there was little doubt after *Picture Music* that the "presumption" of

**5.** The Ninth Circuit had applied the rule of *Yardley* to an independent contractor the previous year without mentioning § 26 or explicitly invoking "works for hire" doctrine, but the language of the opinion can be read to mean the independent contractor worked "for hire" and the purchaser was the statutory "author." *See Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir.1965) ("in the absence of an express contractual reservation of the copyright in the artist, the presumption arises that the mutual intent of the parties is that the title to the copyright *shall be in the person* at whose instance and expense the work is done"; citing *Yardley;* emphasis added).

**6.** The plaintiff was the assignee of a songwriter paid solely *to assist in the adaptation of* "Who's Afraid of the Big Bad Wolf?" from Walt Disney's "The Three Little Pigs." The songwriter "rearrang[ed] musical themes in collaboration with an employee of [Irving] Berlin[, Inc.], and arrang[ed] the existing lyrics and add[ed] new ones of her own," *Picture Music*, 457 F.2d at

1214, and was paid a share of the song's royalties.

**7.** In response to the citation of an earlier case stating that the statutory employer must have the right "to direct and supervise the *manner* in which the writer performs his work," *Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc.*, 375 F.2d 639, 643 (2d Cir.1967) (emphasis added), *cert. denied*, 389 U.S. 1036, 88 S.Ct. 768, 19 L.Ed.2d 823 (1968), the *Picture Music* court emphasized the *theoretical* right to direct and supervise inherent in any transaction where one person hires another:

In short, the "motivating factors" in the composition of the new song ... were [the putative employers] Disney and Berlin. They controlled the original song, they took the initiative in engaging [the independent contractor] Miss Ronell to adapt it, and they had the power to accept, reject, or modify her work.

*Picture Music*, 457 F.2d at 1217.

*Yardley* had been adopted without limitation in "work for hire" doctrine so that whoever commissioned a work was presumed the statutory "author," the Second Circuit soon dispelled all doubt by announcing a pure "instance and expense" test for "works made for hire" in a case involving an independent contractor:

> [The "work for hire"] doctrine is applicable ... when the employee's work is produced at the instance and expense of the employer, or, in other words, when the "motivating factor in producing the work was the employer who induced the creation...."

*Siegel v. National Periodical Publications, Inc.,* 508 F.2d 909, 914 (2d Cir.1974) (quoting *Picture Music*) (citations omitted).

The final chapter of the expansion of the "work for hire" doctrine under the regime of the 1909 Act was written in our Court. In *Murray v. Gelderman,* 566 F.2d 1307 (5th Cir.1978), the author of a book written under contract argued that the book was not a "work made for hire." We responded with the now-familiar litany of the "instance and expense" test:

> The crucial element in this ["employment"] determination appears to be whether the work was created at the employer's insistence [sic] and expense, or, in other words, whether the motivating factor in producing the work was the employer who induced its creation. *Siegel.* Another factor is whether the employer had the *right* to direct and supervise the manner in which the work was being performed. *Picture Music.* Actual exercise of that right is not controlling, and copyright is vested in the employer who has no intention of overseeing the detailed activity of any employee hired for the very purpose of producing the material. *See Yardley.*

566 F.2d at 1310 (emphasis in original; citations omitted). The author contended, however, that the normal "right to control" rules did not apply in her case because she had specifically contracted for complete control over the work and that she would have refused to take the job if the putative employer had demanded a right to control her efforts. Accepting this as true, our Court was unpersuaded:

> Allowing [author] Murray to [succeed on this argument] ... would permit an employee to circumvent the works for hire doctrine simply by demanding creative freedom as a condition of employment. We decline Murray's invitation to adopt such a rule, where, as here, an employer has no intention of supervising the work of an employee hired specifically to produce certain material.

*Id.* at 1311.

Thus at time of the adoption of the 1976 Act, the simple rule of *Yardley* for allocating the risk of uncertainty about whether the copyrights were assigned to the buyer had developed into an almost irrebutable presumption that any person who paid another to create a copyrightable work was the statutory "author" under the "work for hire" doctrine. This presumption could not be avoided even by showing that the buyer had no actual right to control the manner of the production of the work, because the buyer was thought to maintain the "right" to control simply by paying for the work and having the power to refuse to accept it. In other words, the class of persons who counted as "employees" under the copyright statute was far greater than the class of regular or formal employees, and well beyond the somewhat extended class of employees—known as "servants"—under agency law. *See, e.g.,* Restatement (Second) of Agency § 220(1) (1958) ("A servant is a person employed to perform services in the affairs of another and who with respect to the *physical conduct in the performance of the services* is subject to the other's control or right to control.") (emphasis added). Whenever one person bought authorship services from another, the seller was a copyright "employee" and the buyer was a statutory "author."

*C. The 1976 Act and "Work for Hire": Three Interpretations*

The Copyright Act of 1976 initially appears both to adopt and to modify the "work for hire" doctrine. The "work for

hire" doctrine is important because the identity of the author of a work matters for other purposes under the Act regardless of subsequent assignments or transfers of copyright interests by contract or succession. *See* 1 Nimmer & Nimmer, *Nimmer on Copyright* § 5.03[a], at 5–10 (1986). Section 201 of the Act makes the buyer the author and initial owner if the work was made for hire:

(a) Initial Ownership.—Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are co-owners of copyright in the work.

(b) Works Made for Hire—In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

17 U.S.C. § 201(a) & (b). "Work made for hire" is defined in § 101:

A "work made for hire" is—

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire....

17 U.S.C. § 101(1), (2).[8]

The more we examine the statute and cases interpreting it, the more puzzled we become. The language of the statute is equivocal. It appears to draw a distinction between "employment" in § 101(1) and "commissioned" work in § 101(2). Does this mean that all independent contractors are covered, if at all, by § 101(2) and its nine narrow categories?[9] Is "employee" in § 101(1) to be construed as a formal employee, or as an "employee" under the expanded meaning of agency law, or is it to be given its all-embracing 1909 Act scope, swallowing up everything but the discrete activities specified in § 101(2)? There are two completely distinct interpretations of the statute and its interaction with the traditional doctrine based on this ambiguity.[10] Both find support from cases and commentators. Amazingly, both are unsatisfactory and one of our sister circuits has invented a third as a working compromise.

A big part of the problem in both the statute and the cases is that the basic terms are ambiguous. "Employee," for ex-

---

**8.** There is one important and obvious change in the 1976 Act from prior "work for hire" doctrine: we are no longer merely to "presume" that the employer is the "author." Some cases under the 1909 Act allowed this "presumption" to be rebutted by evidence of contrary oral agreements or even by the parties' course of dealing and the usage of trade. *See, e.g., May v. Morganelli-Heumann & Associates,* 618 F.2d 1363, 1369 (9th Cir.1980) (applying 1909 Act; reversing summary judgment to allow introduction of facts to rebut *Yardley* presumption). Under the 1976 Act, by contrast, the buyers successfully invoking the "work for hire" doctrine are "authors" by operation of law; otherwise, the sellers are the authors by operation of law. Only the buyers and sellers of works falling with § 101(2)'s nine categories can decide who will be the statutory author; and then only by compliance with the statute of frauds clause. Some courts and commentators have missed this important change. *See e.g., Marshall v. Miles Laboratories, Inc.,* 647 F.Supp. 1326, 1330

(N.D.Ind.1986) ("There is a rebuttable presumption that the copyright of a work prepared within the scope of the employer-employee relationship is owned by the employer."); Boorstyn, *Copyright Law* § 3:3, at 86 (1981) ("The current Act creates a presumption of ownership in favor of the commissioned party.").

**9.** [A] work specially ordered or commissioned for use (1) as a contribution to a collective work, (2) as part of a motion picture or other audiovisual work, (3) as a translation, (4) as a supplementary work, (5) as a compilation, (6) as an instructional text, (7) as a test, (8) as answer material for a test, or (9) as an atlas....

17 U.S.C. § 101(2) (numbering added).

**10.** The distinction we draw is similar to one proposed in O'Meara, *"Works Made for Hire" Under the Copyright Act of 1976—Two Interpretations,* 15 Creighton L.Rev. 523 (1982).

ample, can mean either a formal employee, *i.e.*, a person on a payroll designated an "employee" by the parties to the hiring contract, it can mean an agency-law "employee," *i.e.*, a "servant" subject to the employer's right to control the *manner* of performance, or a copyright "employee," *i.e.*, a seller of services (whether a formal or agency employee or not) who loses his claim of authorship under "work for hire" analysis. "Employer" and "independent contractor" are ambiguous in correlative ways. Before going further, we adopt several terms that will help us keep important meanings distinct. A "buyer" is the putative legal employer claiming ownership under the "work for hire" doctrine. Similarly, a "seller" is the person against whom a buyer claims, whether an employee or an independent contractor.

### 1. The Literal Interpretation

One way to interpret the 1976 Act is to read § 101 as a reflection of a simple dichotomy in fact between employees and independent contractors. In other words, a court should first determine—using agency law rules [11]—whether or not the seller is an employee or an independent contractor. Then, the court should apply the statute. Section 101(1) applies to sellers who are employees. If the work was in the scope of employment, an agency-law employee is a copyright employee, and the employer is the "author." Section 101(2) applies to independent contractors. All works by independent contractors—"work[s] specially ordered or commissioned"—are *not* works for hire unless the work comes within the nine narrow statutory categories *and* parties agree in a signed instrument. Section 101(2) is really statutory *permission* for certain kinds of independent contractors to give "authorship" to their buyers. The nine kinds of activities listed in § 101(2) support this interpretation because they all involve situations where, in addition to owning the copyrights in the works by contract, it would be very useful for buyers to be able to become statutory "authors."

The "literal" interpretation is implicit in a number of cases. *See, e.g., May v. Morganelli-Heumann & Associates*, 618 F.2d 1363, 1368 n. 4 (9th Cir.1980); *Whelan Associates v. Jaslow Dental Lab*, 609 F.Supp. 1307, 1319 (D.C.Pa.1985), *aff'd on other grounds*, 797 F.2d 1222 (3d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987); *Everts v. Arkham House Publishers, Inc.*, 579 F.Supp. 145, 148 (W.D.Wis.1984); *Childers v. High Society Magazine, Inc.*, 557 F.Supp. 978, 984 (S.D.N.Y.1983); *BPI Systems, Inc. v. Leith*, 532 F.Supp. 208, 210 (W.D.Tex.1981); *Mister B Textiles Inc. v. Woodcrest Fabrics, Inc.*, 523 F.Supp. 21, 24 (S.D.N.Y. 1981); *Meltzer v. Zoller*, 520 F.Supp. 847, 854–55 (D.N.J.1981). This interpretation is somewhat bolstered by highly ambiguous language, which we set out in the margin, in the House Report to the bill that became the 1976 Act.[12] Professor Nimmer seems

---

**11.** There is no reason to read the statute as creating a distinction between formal employees and formal independent contractors. It would be odd for Congress to use the term "employee" to mean "formal employee," when there is no relevant body of law that draws a line between "formal" employees and "formal" independent contractors. Moreover, in the vast majority of employment situations formal employees are employees under agency law and vice versa.

**12.** *Works Made for Hire*
  Section 201(b) of the bill adopts one of the basic principles of the present law: that in the case of works made for hire the employer is considered the author of the work, and is regarded as the initial owner of copyright unless there has been an agreement otherwise. The subsection also requires that any agreement under which the employee is to own rights be in writing and signed by the parties.
  The work-made-for-hire provisions of this bill represent a carefully balanced compromise, and as such they do not incorporate the amendments proposed by screenwriters and composers for motion pictures. Their proposal was for the recognition of something similar to the "shop right" doctrine of patent law: with some exceptions, the employer would acquire the right to use the employee's work to the extent needed for purposes of his regular business, but the employee would retain all other rights as long as he refrained from the authorizing of competing uses. However, while this change might theoretically improve the bargaining position of screenwriters and others as a group, the practical benefits that individual authors would receive are highly conjectural. The presumption that initial ownership rights vest in the employer for hire

to adopt this view, although his version is distorted by the notion that the statute merely tracks a preexisting distinction in the cases.[13]

There are two problems with the "literal" interpretation. First, § 201(b) reads: "In the case of a work made for hire, the employer *or other person for whom the work was prepared* is considered the author for purposes of this title ..." (empha-

sis added). This language sounds exactly like an affirmation of the 1909 Act "work for hire" doctrine. It is too broad to be easily read as a reference to the narrow class of buyers who can be authors by compliance with the requirements of § 101(2). Second, if the literal interpretation is accurate, that means that Congress intended to *radically* revise "work for hire" doctrine. We have seen that buyers

---

is well established in American copyright law, and to exchange that for the uncertainties of the shop right doctrine would not only be of dubious value to employers and employees alike, but might reopen a number of other issues.

The status of works prepared on special order or commission was a major issue in the development of the definition of "works made for hire" in section 101, which has undergone extensive revision during the legislative process. The basic problem is how to draw statutory line between those works written on special order or commission that should be considered as "works made for hire," and those that should not. The definition now provided by the bill represents a compromise which, in effect, spells out those specific categories of commissioned works that can be considered "works made for hire" under certain circumstances.

H.R.Rep. No. 1476, 94th Cong., 2d Sess. 121, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5659, 5736–37.

**13.** At first, Professor Nimmer's explanation of the new "work for hire" doctrine appears to be self-contradictory. On the one hand, he says that the 1976 Act does not change the expansive definition of "employment" developed under the 1909 Act, and that courts should look to cases decided under the 1909 Act to determine whether a seller is a statutory "employee." *Nimmer* at 5–12 (citing cases like *Picture Music* and *Murray v. Gelderman* ). This sounds like the "conservative" view. Then a few pages later he says:

Not every work prepared by an independent contractor on special order or commission is considered the equivalent of a work made for hire. Under the statutory definition [in § 101(2)] the "for hire" status is applicable only to works specially ordered or commissioned [within the nine categories]....

*Nimmer* at 5–18. This sounds like the "literal" view.

Professor Nimmer is able to make sense out of the distinction between "employees" in § 101(1) and independent contractors in § 101(2) because he thinks this distinction existed in prior law. He views the "work for hire" copyright cases defining "employee" under the 1909 Act as merely a particular version of the general law of agency rather than an indepen-

dent and uniquely expansive definition of "employee." *Id.* at 5–12. Moreover, in Nimmer's view there was a distinction in the case law under the 1909 Act between "employees"—defined as in agency law to include others besides formal employees—and independent contractors. Independent contractors (like the artist in *Yardley* ) were only "presumed" to have *assigned* the copyrights in the work. *Id.* at 5–23 & n. 68. According to Nimmer, these "independent contractor" cases all involved sellers who were beyond the statutory definition of "employee" and were treated distinctly. *Id.* at 5–21 & n. 60 (citing *Brattleboro Publishing, Lin-Brook Builders, Yardley,* etc.). Only a few cases like *Murray v. Gelderman* went so far as to hold explicitly that even commissioned independent contractors were "employees" under the "work for hire" doctrine. *Id.* at 5–13 n. 20.

With all respect, we think the distinction urged by Professor Nimmer was erased long before the 1976 Act's arrival. The whole point of *Brattleboro Publishing* was to apply the presumption of *Yardley* to make an independent contractor—independent in both fact and law—into a copyright "employee" so that the buyer was the "author." That point was made over and over again until in 1976 a district judge could matter-of-factly dispose of an argument based on the undisputed "independent contractor" status of the seller by holding that the independent contractor was a copyright "employee." *See Goldman-Morgen, Inc. v. Dan Brechner & Co.,* 411 F.Supp. 382, 391 (S.D.N.Y. 1976); *see also Real Estate Data, Inc. v. Sidwell Co.,* 809 F.2d 366, 371 (7th Cir.1987) (summarizing "work for hire" cases under 1909 Act; independent contractor were statutory "employees"). The copyright "employment" cases Nimmer cites as agency law equivalents go *far* beyond "employment" in the agency law sense. *Nimmer* at 5–12.1 & nn. 17.1, 18. He even distinguishes *Aldon Accessories Ltd. v. Spiegel, Inc.,* 738 F.2d 548 (2d Cir.), *cert. denied,* 469 U.S. 982, 105 S.Ct. 387, 83 L.Ed.2d 321 (1984), discussed below, as a particularly tight application of copyright "employment" since that case requires that the buyer *actually control* the work of the seller. *Id.* at n. 17.1. Professor Nimmer's distinction between "employment" and "commissioned works" in the case law is invisible to us, and thus does not resolve our quandary about the meaning of the new statute.

were almost always "authors" under the expansive "work for hire" doctrine of 1909 Act. Under the literal interpretation of the 1976 Act, independent contractors are always statutory "authors" unless they have written certain kinds of works and have signed away their authorship rights. Several courts have refused to adopt this interpretation because Congress gave no clear expression of legislative intent to alter the "work for hire" doctrine so fundamentally. *See, e.g., Aldon Accessories Ltd. v. Spiegel, Inc.*, 738 F.2d 548, 552 (2d Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 387, 83 L.Ed.2d 321 (1984). Still, as we discuss below, the advantages of this interpretation are great.

### 2. The Conservative Interpretation

A few courts have attributed little significance to the 1976 Act. Their analysis goes something like this: Under § 201(b) and § 101(1) we do a traditional "work for hire" analysis. It doesn't matter whether the seller is a formal employee or an independent contractor. If the work was undertaken at the instance and expense of the buyer, and if the buyer had the *right* to control the work, regardless of whether or not the right was exercised, then the seller was a (legal) employee within the meaning of § 101(1). If the buyer would win under traditional anaylsis, then the court looks to see if the disputed work falls within the nine categories in § 101(2). These categories are accorded special treatment, and the buyer will be the author only if he has complied with the requirement of a written agreement. In other words, § 101(2) carves out special protections from the expansive old doctrine for a narrow group of sellers. This is the only interpretation that fits comfortably with the "other person for whom the work was prepared" language in § 201(b). There are only a few "work for hire" cases under the 1976 Act that appear to adopt the "conservative" view of the statute, and the outcome in those cases does not necessarily turn on their use of this interpretation. *See, e.g., Peregrine v. Lauren Corporation*, 601 F.Supp. 828, 829 (D.Colo.1985); *Town of Clarkstown v.*

*Reeder*, 566 F.Supp. 137, 141–42 (S.D.N.Y. 1983).[14]

The problem with the "conservative" interpretation is that we cannot avoid the impression that Congress meant somehow to tighten up the "work for hire" doctrine under the 1976 Act, although it failed to make clear where and how this tightening is to take place. For example, this interpretation, unlike the "literal" one, makes the nine narrow categories in § 101(2) completely mysterious. Why does an author of "answer material for a test" get special protections from traditional expansive "work for hire" doctrine when a musician or a sculptor does not? The activities in § 101(2) look like the kind of activities where the buyer normally wants and needs to be a statutory author in order to gain complete initial ownership of a collaborative project. It would be anomalous to give these activities special protections beyond those accorded other types of commissioned works. We are convinced that Congress meant to alter the status of commissioned works, which means that it meant to alter the "work for hire" doctrine under the 1909 Act. The problem is figuring out the precise contours of the intended alteration.

### 3. The Aldon Accessories Compromise

The two interpretations that we have described are unsatisfactory for one reason or another. Thus, it is not surprising that the courts have come up with another. This third view, first proposed in *Aldon Accessories Ltd. v. Spiegel, Inc.*, 738 F.2d 548 (2d Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 387, 83 L.Ed.2d 321 (1984), is more an interpolation of the statute than an interpretation of it. But given the problems of the "literal" and "conservative" approaches, the Second Circuit apparently thought that an interpolation might be the best way out of the "work for hire" conundrum.

Aldon Accessories Ltd. designed and marketed figurines and other decorative pieces. Arthur Ginsberg, a principal of Aldon Accessories, decided to produce a line of statuettes depicting mythological

**14.** Recognizing that the field tapes may be "works specially ordered or commissioned for use...as part of a motion picture or other audio-visual work," the Society advances an even more

creatures, including a unicorn and a Pegasus. *Id.* at 549. He contacted Wado International Corp., a Japanese firm, to aid in the design and production of the statuettes. After some initial exchanges of descriptions and sketches, Ginsberg traveled to Japan to work with artists hired by Wado to develop his ideas into models. Over the course of three days, Ginsberg and the artists produced drawings and a clay model. Ginsberg worked conjunctively with the artists throughout the process, giving minute-by-minute instructions and judging their product at each step in the process. For example, Ginsberg testified: "[T]he model was prepared in front of me, and we spent hours and hours changing shapes, adjusting attitudes and proportions until finally I thought there was a model that I liked." *Id.* at 550. Aldon Accessories eventually marketed porcelain and brass versions in different sizes, with slight variations in design. Spiegel, Inc., began selling similar brass figurines. Aldon Accessories sued for copyright infringement and won a jury verdict. On appeal, Spiegel's main argument was that because Aldon Accessories used independent contractors to create the figurines, it did not own the copyright under the new "work for hire" doctrine of the 1976 Act.

Chief Judge Feinberg of the Second Circuit said something like this:[15] Congress was unhappy with the broad sweep of the "work for hire" doctrine. On the other hand, it did not mean to abolish completely the flexible approach of the doctrine, or to impose a mechanical test of formal employee versus formal independent contractor without regard to the realities of input and control. Therefore, we will read the statute as merely tightening up the old doctrine with respect to formal independent contractors. The theoretical right to control, present in most circumstances where one party is paying another, is no longer enough. We now require *actual* participation in and control of the creative process by the buyer. The person who simply commissions a work of art and takes delivery is no longer "presumed" to be the author, and § 101(2) applies. But if the buyer participates significantly in the creative process and exercises significant control over it, then the "work for hire" doctrine applies and the buyer is the author of that work, regardless of the fact that the seller was hired as a freelance. The class of "employees" under the 1976 Act is therefore far narrower than under the 1909 Act, although the application of the "work for hire" doctrine in a given case depends on exactly how the work was produced. The court makes the test: "[I]s the contractor 'independent' or is the contractor so controlled and supervised in the creation of the *particular work* by the employing party that an employer-employee relationship exists. The latter is covered by [§ 101] subdivision (1)." *Id.* at 552–53 (emphasis added). In other words, the buyer must supervise and control the creation of the disputed work to be the statutory "author." On this ground the *Aldon Accessories* court upheld a much more ambiguous and doubtful jury instruction.[16]

conservative version of the "conservative" interpretation. It contends that even the activities listed in § 101(2) must first be analyzed under § 101(1) and the expansive test of the 1909 Act. We think this interpretation utterly implausible, and discuss it no further.

**15.** The *Aldon Accessories* opinion is a bit more circumspect than our summary. It first holds that "employees" in § 101(1) is not limited to formal employees on the theory that Congress would not have changed prior law so drastically without any discussion of that change in the legislative history. *Id.* at 552. Then, the opinion shifts gears: "The legislative history does indicate that Congress intended to change prior work for hire law dealing with 'works prepared on special order or commission....'" *Id.* But Congress did not intend to change the outcome for actual independent contractors "who were sufficiently supervised and directed by the hiring party to be considered 'employees' acting within the 'scope of employment.'" Therefore, the question is whether the buyer so controlled the creation of a particular work that the independent contractor should be considered the statutory author. *Id.*

**16.** The disputed jury instruction was:
   A work for hire is a work prepared by what the law calls an employee working within the scope of his employment. What that means is, a person acting under the direction and supervision of the hiring author, at the hiring author's instance and expense. It does not matter whether the for-hire creator is an employee in the sense of having a regular job with the hiring author. What matters is whether the hiring author caused the work to be made and exercised the right to direct and supervise the creation.
   *Aldon Accessories,* 738 F.2d at 551.

A number of courts have adopted the reasoning of *Aldon Accessories* as the definitive interpretation of the new "work for hire" under the 1976 Act. *See, e.g., Evans Newton Inc. v. Chicago Systems Software*, 793 F.2d 889, 894 (7th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 434, 93 L.Ed.2d 383 (1986); *Marshall v. Miles Laboratories, Inc.*, 647 F.Supp. 1326, 1331 (N.D.Ind.1986); *Sygma Photo News, Inc. v. Globe International, Inc.*, 616 F.Supp. 1153 (S.D.N.Y. 1985); *cf. Joseph J. Legat Architects v. United States*, 625 F.Supp. 293, 298 (N.D. Ill.1985) (buyer never has right to control "day-to-day" work of professional architect/formal independent contractor; therefore architectural drawings not "works made for hire"); *Aitken, Hazen, Hoffman, Miller v. Empire Construction Co.*, 542 F.Supp. 252 (D.Neb.1982) (same). The district court in this case relied on *Aldon Accessories* in ruling that the field tapes were not made "for hire." Like all compromises, this interpretation of the 1976 Act has some attraction; but it is ultimately unsatisfying.

The "work for hire" issue in *Aldon Accessories* arose as a defensive tactic adopted by a third-party infringer to dispute the validity of the plaintiff's copyright. This posture makes the "literal" reading of the 1976 Act particularly unattractive, because it is the infringer and not the independent contractor who will benefit from a ruling that the work was not made "for hire." In other words, the *Aldon Accessories* court may have been driven to create the narrow "actual control" exception to the general rule that independent contractors hold the copyright under the 1976 Act by the fact that on appeal the defendant more or less conceded infringement but tried to escape liability on "work for hire" grounds. What the court did not appear to bear in mind is that any buyer satisfying a seriously enforced "actual control" test will ordinarily be a co-author of the work, entitled to bring and win an action for infringement against a third party.

This was precisely the solution adopted in *Mister B Textiles Inc. v. Woodcrest Fabrics, Inc.*, 523 F.Supp. 21, 24 (S.D.N.Y. 1981), by a district court faced with the "literal" interpretation of the 1976 Act. The plaintiff has hired a freelance designer to help create a new fabric design. When sued for infringing this design, the defendant argued that the plaintiff did not own the copyright because the design was created by an independent contractor. The court noted that "defendant's position appears to be correct," 523 F.Supp. at 24, but held for the plaintiff anyway. The court reasoned that one of the plaintiff's regular employees had closely supervised the creation of the new design, that this employee was therefore a co-author, and that the plaintiff was therefore a statutory co-"author" under the "work for hire" doctrine. *Mister B Textiles* shows how the "actual control" rule of *Aldon Accessories* was unnecessary under the facts of that case.

There are other problems with the *Aldon Accessories* compromise. Because the "work for hire" status turns on the actual control by the buyer with respect to *each work* (as the *Aldon Accessories* court makes clear), the outcome can vary even between the same buyer and same seller in a series of works produced together. For example, if Mr. Ginsberg now calls Wado International and asks them to produce several additional statuettes for his line of mythological creatures based on their acquired knowledge of what he likes, but he does not directly supervise the production, Aldon Accessories would lose a subsequent infringement suit against Spiegel. The rule of *Aldon Accessories* makes business arrangements exceedingly difficult. Rather than making a relatively simple judgment about whether the seller is an employer or an independent contractor, and relying on "work for hire" rules or arranging for copyright assignments accordingly, buyers and sellers will have to predict in advance whether the buyer's "actual control" over a given work will make it the "author." If they guess incorrectly, their reliance on "work for hire" or an assignment may give them a copyright interest that they did not bargain for.

Moreover, the *Aldon Accessories* test does not provide us with some kind of

unified field theory of "work for hire" doctrine. Under *Aldon Accessories*, a court must still determine whether the seller was an employee or independent contractor because the test applies only to independent contractors. We think it safe to assume—because the contrary result would be almost unimaginable—that the Second Circuit would not apply the "actual control" test to determine if an employer was the "author" of works produced by actual employees within the scope of their employment. In other words, if Mr. Ginsberg hired an artist as an employee of Aldon Accessories, he would not need to actually supervise the work of the artist in order for Aldon to own the copyright as the statutory "author." So *Aldon Accessories* only adds a level of complication to the underlying employee/independent contractor analysis required by the "literal" interpretation.

Finally, the "actual control" test, although taken quite seriously in *Aldon Accessories* itself, can gradually slide into a "right to control" test, just as in the old "work for hire" doctrine the "right to control" test from agency law gradually slid into an almost absolute (though frequently false) presumption that whoever paid for creation of the work had the "right" to control its production. This is not mere pessimistic speculation on our part; we see evidence of this trend already in *Evans Newton Inc. v. Chicago Systems Software*, in which the Seventh Circuit adopted the rule of *Aldon Accessories*. Evans Newton Inc. ("ENI") had hired Chicago Systems Software ("CSS") to write a school record-keeping program and accompanying manual according to ENI's flow charts and design specifications. The court was unable to recount any evidence that ENI "actually controlled" CSS's production of the computer program or manual, but it quoted the questionable jury instruction affirmed in *Aldon Accessories*[17] as an "accurate

expression" of the law, and held without discussion that the district court's determination that a principal of ENI "supervised and directed the work" was not clearly erroneous.[18] *Evans Newton*, 793 F.2d at 894 & n. 5.

To summarize, then, there are four problems with the "actual control" test of *Aldon Accessories*: (1) the rule is unnecessary in cases where "work for hire" is raised by the defendant to question the validity of the plaintiff's copyright since any plaintiff who actually controls an independent contractor will be a co-author of the work; (2) it makes the outcome of "work for hire" analysis too fact-specific for each work and therefore less predictable by buyers and sellers; (3) it does not eliminate the need for a determination of employee versus independent contractor since the "acutal control" test applies only to independent contrctors; (4) it slides too easily into the vague and expansive "right to control" test, as the decision in *Evans Newton* may portend.

And on top of these problems there is one insurmountable problem with the *Aldon Accessories* rule; we have already alluded to it by calling this view an interpolation of the statute. There is simply no way to milk the "actual control" test of *Aldon Accessories* from the language of the statute. Even were the language of the statute to produce absurd results, we would depart from it with trepidation. As it happens, the simple reading of the statute does not lead to absurd results; on the contrary. Therefore, we reject the rule of *Aldon Accessories*.

### 4. Our Choice: The "Literal" Interpretation

■ We conclude that the "literal" interpretation is the best interpretation of the 1976 Act. We hold that a work is "made

---

17. *See supra* note 15.

18. Under the 1909 Act, the Second Circuit held that the final answer to question of employment under the "work for hire" doctrine was a legal conclusion, reviewable *de novo* in the court of appeals. *See, e.g., Picture Music, Inc. v. Bourne,*

*Inc,* 457 F.2d 1213, 1215 n. 5 (2d Cir.), *cert. denied,* 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972). It is not clear whether the rule of *Aldon Accessories* —or intervening Supreme Court cases on Federal Rule of Civil Procedure 52(a)—will alter that view.

for hire" within the meaning of the Copyright Act of 1976 if and only if the seller is an employee within the meaning of agency law, or the buyer and seller comply with the requirements of § 101(2). We recognize that this interpretation is a radical break from "work for hire" doctrine under the 1909 Act, but there are good reasons for this break. The necessary and sufficient reason, of course, is that it is the best interpretation of the actual language of the "work for hire" definition in the 1976 Act. Recall that the statute appears to set up a simple dichotomy:

A "work made for hire" is—

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned. . . .

17 U.S.C. § 101(1), (2). The words "employee" and "employment" are used in many legal contexts, but "scope of employment" is virtually a term of art in agency law. Furthermore, the "specially order or commission" phrase is reminiscent of the "work for hire" cases applying the *Yardley* presumption to make copyright "employees" out of independent contractors. Only the "other person for whom the work was prepared" clause of § 201(b) remains somewhat mysterious under our view.

The "literal" interpretation of the 1976 Act has more in its favor. First, as we noted above, this interpretation makes sense out of the nine narrow categories in § 101(2): they are statutory *permission* to allow certain kinds of independent contractors to sign away their authorship to their buyers. Second, this interpretation ties the meaning of "work for hire" to a well-developed doctrine in agency law. Although there is no general federal agency law and adopting state agency law would not give copyright law the requisite national uniformity, federal courts can turn to early copyright cases before the encroachment of the *Yardley* rule, and to the general principles embodied in the Restatement of Agency Law,[19] in order to make considered decisions in "work for hire" adjudication. Third, this approach gives buyers and sellers the greatest predictability. In most situations it will not be difficult for a buyer or seller to determine whether the seller is an employee or an independent contractor, and to structure their contractual relations accordingly. Finally, adopting an agency-law definition of copyright "employment" creates a certain moral symmetry: a buyer is a statutory "author" if and only if he is responsible for the negligent acts of the seller. For example, a buyer will only be the "author" of a writing if he would be liable under *respondeat superior* in a defamation action based on that writing.

Courts must use common sense and consider the sort of factors set out in the Restatement to determine whether a given seller is an employee.[20] "Actual control"

---

**19.** It is perhaps one of the great ironies of twentieth-century legal thought that the Restatements now provide in many fields a sort of general common law. The heavy skepticism of proto-legal realists like Justices Holmes and Brandeis found voice in *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Erie* burst the bubble of the "brooding omnipresence in the sky," and seemed to signal the death of general common law. But concerns about the vacuum left by *Erie* fueled the American Law Institute movement, which in turn produced the Uniform Commercial Code, the Model Penal Code, and the Restatements. Now, when we need to resort to a statement of the general common law, we have nowhere to turn but to these omnipresent responses to its demise.

**20.** The Restatement reads:

§ 220. Definition of a Servant

(1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.

(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

or the "right to control" are relevant, but alone they cannot make an otherwise independent contractor into an employee. Conversely, the lack of actual control over the production of a given work—and perhaps even the *right* to control production[21]—will not make an independent contractor out of an employee. Moreover, there is no reason for the employee/independent contractor determination to be swayed by the well-established if unprincipled tendency of courts to rule that an independent contractor is an employee in order to reach a deep pocket in a tort action under the doctrine of *respondeat superior.* Assuming the proper legal standard is used, the question of employee/independent contractor status is a question of fact for the trier of fact, and on appeal we will defer to the appropriate extent.

The Easter Seal Society would probably lose on its claim that the field tapes were "works made for hire" under any view of the 1976 Act. Because it appears that the field tapes were commissioned as part of an audiovisual work within the meaning of § 101(2), even the "conservative" interpretation might not get them to the promised land. Given our conclusion about the statute's meaning, the Society most certainly loses. The Society has never contended that WYES was not an independent contractor hired to create the disputed work. Perhaps anticipating this outcome, the Society shifts ground and raises one final argument which we now consider.

*D. Co-Authorship and "Work for Hire"*

The Easter Seal Society argues that this case is different from the usual "work for hire" case because the subject matter or content of the disputed videotapes was itself a work of authorship by the Society's (volunteer) employees that simply required fixation to be copyrightable. Put more concretely, the Society contends that the parade and the musical jam session were "original works of authorship" and that WYES merely provided the mechanical fixation of those works in a "tangible medium." *See* 17 U.S.C. § 102(a). In support of this theory, the Society recites cases that involve the copyrightability of broadcasted sporting events. *See Baltimore Orioles v. Major League Baseball Players Ass'n,* 805 F.2d 663 (7th Cir.1986); *National Association of Broadcasters v. Copyright Royalty Tribunal,* 675 F.2d 367 (D.C. Cir.1982); *National Football League v. Cousin Hugo's, Inc.,* 600 F.Supp. 84 (E.D. Mo.1984). According to the Society, these cases establish that the sports clubs and not the broadcasters own the copyrights to sports performances. They argue that, by analogy, the copyrights in videotapes of a musical performance should belong to the musicians. WYES responds with a citation to *Production Contractors, Inc. v. WGN Continental Broadcasting,* 622 F.Supp. 1500 (N.D.Ill.1985), which it claims stands for the proposition that parades and such are not copyrightable; it does not mention the copyrightability of the jam session.

The sports cases are not as broad as the Society might wish. They involve disputes over royalties and claims between sports clubs and third parties, not direct copyright disputes between sports clubs and broadcasters. In *Baltimore Orioles,* for example, the court held that baseball clubs hold the copyright interests in their players' per-

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; and (j) whether the principal is or is not in business.

**21.** It is arguable whether, for example, an employer has the right to control the manner of performance by professional employees—doctors, lawyers, architects and the like—whose work-product is governed by state law and professional codes. *Cf. Joseph J. Legat Architects v. United States,* 625 F.Supp. 293, 298 (N.D.Ill. 1985); *Aitken, Hazen, Hoffman, Miller v. Empire Construction Co.,* 542 F.Supp. 252 (D.Neb.1982). Although we leave the decision for another day, it seems to us at first blush that an employer would still be the "author" of copyrightable works by professional employees.

formances under the "work for hire" doctrine. That case does not hold that the clubs are "authors" of the broadcasts, although, as a practical matter, the bargaining position of a sports team will generally allow it to claim the broadcast copyrights *by contract* with the radio or television broadcaster. Similarly, *National Association of Broadcasters* was a review of the distribution of royalties by the Copyright Royalty Tribunal in which the court affirmed the Tribunal's decision that sports clubs should receive most of the royalties from sports broadcasts. The court explicitly recognized that the fixation by the broadcasters and their contributions of camera angles, editing, and commentary was enough to create an original work of authorship, but it held that these contributions did not alter the fact that the sports clubs contributed the key commercial elements of the broadcasts, and thus deserved most of the royalties.

■ To the extent that the Society is claiming that WYES provided only mechanical fixation of the Society's production without the requisite originality and creativity for making a copyrightable work, we reject their contention out-of-hand. WYES did not simply set up one camera on a tripod, turn it on and sit down to watch. Instead, it worked cooperatively and dynamically with the performers to create the field tapes. This work was a work of authorship. The House Report on the 1976 Act speaks directly to this question in the context of a discussion of the fixation requirement for live broadcasts: "When a football game [for example] is being covered by four television cameras, with a director guiding the activities of the four cameramen and choosing which of their electronic images are sent out to the public and in what order, there is little doubt that what the cameramen and the director are doing constitutes 'authorship.'" H.R.Rep. No. 1476, 94th Cong., 2d Sess. 52, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5659, 5665.

On the other hand, we agree with the Society that at least the musical performance by its volunteers—if not the staged parade—was a work of authorship that needed only fixation to be copyrightable. And in this case, the process of fixation also was sufficiently creative and original to be a work of authorship. Although the parties have refused to acknowledge it for their own reasons, it seems clear to us that at least the field tapes depicting the musical performances were interdependent joint works of authorship by the Society and WYES. *Cf. Nimmer* § 6.04–05 ("Thus a motion picture is a joint work consisting of a number of contributions by different 'authors.' [Footnote:] The contributing 'authors' include, in addition to the writer of the screenplay, the director, the photographer, the actors, and arguably, other contributors such as the set and costume designers, etc."). Thus, the proper question, which the parties have failed to address, is whether the "work for hire" doctrine alters the authorship of a joint work made by a hiring party and an independent contractor. We see no reason why it should. Nor do we see reason to vacate the district court's probably incorrect ruling that WYES was the sole author and owner of the field tapes, because the Society has never argued that it was a co-author of the field tapes, and because even had it done so the use of the field tapes by co-author and co-owner WYES and the other defendants would not be an infringement of the Society's copyright interests.

### E. Conclusion

■ Today we adopt a bright-line rule for determining whether a work was made "for hire" under the 1976 Act. Only works by actual employees and independent contractors who fulfill the requirements of § 101(2) can be "for hire" under the new statute. Copyright "employees" are those persons called "employees" or "servants" for purposes of agency law. Because WYES was an independent contractor, the Easter Seal Society was not the statutory "author." Therefore, the use of the field tapes in "Candy, the Stripper" could not have infringed on the Society's rights, and the judgment of the district court is AFFIRMED.