REVISED, May 8, 1998

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-40950
_____


ABRAHAM QUINTANILLA, JR., doing business
as Selena y Los Dinos, Individually, and
as Independent Administrator of the Estate
of Selena Quintanilla Perez, ABRAHAM
QUINTANILLA, III, doing business as AQIII
Music, doing business as Five Candles Music,
Individually, RICKY VELA, doing business
as Lone Iguana Music, Individually, PETE
ASTUDILLO, doing business as Peace Rock
Music, Individually, and CHRISTOPHER G. PEREZ,

                          Plaintiffs-Appellants,

                versus

TEXAS TELEVISION INCORPORATED, doing business
as McKinnon Broadcasting Company, doing
business as KIII-TV ("KIII"),

                          Defendant-Appellee.


_____

        Appeal from the United States District Court for
              the Southern District of Texas
_____
                    April 17, 1998

Before REAVLEY, JONES and BENAVIDES, Circuit Judges.

REAVLEY, Circuit Judge:

     This is a copyright case.  The father of the popular singer,

Selena, sued a television station for infringement of his rights

in a videotape of a concert that was made by the station.  The

district court granted summary judgment for the defendant

television station.  Because the proof will not support plaintiffs' claim to sole ownership of the videotape, we affirm.

BACKGROUND

Appellant Abraham Quintanilla, Jr. (Quintanilla) is the father of Selena Quintanilla Perez (Selena).  Selena led a Tejano band named Selena y Los Dinos (the band).  Quintanilla was the manager and owner of the band.

On February 7, 1993, the band performed a live concert at the Memorial Coliseum in Corpus Christi.  By agreement between Quintanilla and Jay Sanchez, a director for appellee Texas Television, Inc. d/b/a KIII-TV (KIII), the concert was recorded on videotape by KIII personnel.  Prior to the concert, Sanchez sent Quintanilla a note stating: "Thank you for allowing us to videotape the concert tomorrow night. . . .  As per our agreement, we will use the video on the Domingo Show and other news shows.  In turn, we will provide you with a master copy on 3/4 to use for promotional purposes."   Later, Sanchez sent videotapes of the concert to Quintanilla, with a note stating: "As we agreed, enclosed please find copies of the concert for your use.  In exchange, we will use the footage on the Domingo Show."

Appellants contend that after the concert, songwriters (the Songwriters) whose compositions had been performed at the concert obtained copyright registrations for the songs with the United States Copyright Office, and Quintanilla obtained a copyright registration for the videotape.  The parties do not dispute that

2

Quintanilla acted as agent for the Songwriters in entering into the agreement with KIII.

After Selena's death, KIII aired portions of the videotape on its programs, including a March 31, 1996 "Selena Special" on the anniversary of her death. Quintanilla and the Songwriters brought this suit against KIII, alleging copyright infringement and state law claims.[1] Quintanilla claimed that he is the exclusive owner of the copyright to the videotape and that KIII received only a limited nonexclusive license to use the concert footage on a single KIII entertainment show, The Domingo Show. In addition to claims under the Copyright Act,[2] the complaint asserted state law claims under the court's supplemental jurisdiction, including claims for breach of contract, misappropriation of name or likeness, fraud, deceptive trade practices, and negligent misrepresentation.

The district court granted summary judgment in favor of KIII on the copyright claims, and dismissed the remaining state law claims without prejudice.

---

[1] Quintanilla sued individually, doing business as Selena y Los Dinos, and as administrator of Selena's estate. Christopher Perez, Selena's surviving husband and a band member, also appeared as a plaintiff, along with Abraham Quintanilla, III (Quintanilla's son), Ricky Vela and Pete Astudillo, who were band members and were identified in the complaint as Songwriters. The appellate briefs further list band members Suzette Arriaga (Quintanilla's daughter) and Joe Ojeda as appellants.

[2] 17 U.S.C. §§ 101-1101.

DISCUSSION

Summary judgment is appropriate if the record discloses "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[3] Under modern summary judgment practice "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[4] We conclude that the district court properly granted summary judgment on the federal copyright claims.

A.   *Work Made for Hire Doctrine*

Quintanilla argues that he is the exclusive owner of the copyright in the videotape because the videotape was a work made for hire, and KIII's efforts in making the videotape fall within that doctrine. As the Supreme Court explained in *Community for Creative Non-Violence v. Reid*, the Copyright Act "provides that copyright ownership 'vests initially in the author or authors of the work,'" and the author is generally the party "who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection."[5]

---

[3]   Fed. R. Civ. P. 56(c).

[4]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511 (1986) (citations omitted).

[5]   490 U.S. 730, 737, 109 S. Ct. 2166, 2171 (citing 17 U.S.C. §§ 102, 201(a)).

4

The Act provides differently for works made for hire, where "the employer or other person for whom the work was prepared is considered the author" and owns the copyright, absent an agreement between the parties to the contrary.[6] The Act defines two sets of circumstances in which a work is made for hire:

A "work made for hire" is—

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as . . . a part of a motion picture or other audiovisual work . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.[7]

Quintanilla produced no written instrument where the parties expressly agreed "that the work shall be considered a work made for hire" as required by the second subsection of the definition. Quintanilla therefore can prevail on his work for hire theory only if the KIII personnel sent to videotape the concert were his "employees" under the first subsection of the definition. In *Reid*, the Court held that general principles of agency law apply when deciding whether the work in issue was prepared by an "employee" rather than an independent contractor.[8]

---

[6]   17 U.S.C. § 201(b).

[7]   *Id.* § 101.

[8]   *Reid*, 490 U.S. at 750-51, 109 S. Ct. at 2178.

Looking to the factors named in *Reid*,[9] KIII established as a matter of law that the personnel it sent to videotape the concert were not employees of Quintanilla. Quintanilla's argument mainly centers on the right of control. In *Reid*, however, the Court made clear that "the hiring party's right to control the manner and means by which the product is accomplished" is just one of numerous factors to consider, and that "the extent of control the hiring party exercises over the details of the product is not dispositive."[10] On this factor, the evidence is not so much in dispute as its import. Quintanilla offered evidence that he selected the forum, controlled the lighting and stage setup for the concert, and was the overall producer of the concert. KIII counters that it controlled the creation of the videotape. While Quintanilla told Sanchez where he wanted the two fixed and roving cameras located and told members of the camera crew when certain parts of the concert were coming up so they could get good

---

[9] Under agency law, the following factors are relevant in deciding whether the hired party is an employee versus an independent contractor: (1) the hiring party's right to control the manner and means by which the product is accomplished; (2) the skill required; (3) the source of the instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party has the right to assign additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants; (10) whether the work is part of the regular business of the hiring party; (11) whether the hiring party is in business; (12) the provision of employee benefits; and (13) the tax treatment of the hired party. *Id*. at 751-52, 109 S. Ct. at 2178-79. No one factor is determinative. *Id*. at 752, 109 S. Ct. at 2179.

[10] *Id*. at 751-52, 109 S. Ct. at 2178-79.

6

images, the evidence shows that KIII had ultimate control over the creation of the videotape. KIII sent a seven-member crew to film the event. It provided four cameras all linked to a "Live Eye" truck where Sanchez worked during the concert. Sanchez, an experienced director, decided which of the four images streaming into the truck simultaneously would be used. Sanchez communicated with the KIII cameramen by microphone and directed them to focus on certain images or to set up certain camera angles or shots throughout the concert. He testified that while Quintanilla made suggestions about camera placement, the final decision was his. Quintanilla had no authority over the editing of the tapes done after the concert. Quintanilla conceded that "I don't know anything about that [camera] equipment," and that, with reference to the camera truck, "I don't know anything about how those things work."

In short, Quintanilla had control over the concert, but did not control the manner in which KIII taped the event. He may have made useful suggestions to the camera crew, about such things as when the lighting was about to change, but Sanchez had ultimate authority to tell the camera crew what to do. KIII had sole discretion to decide which of four simultaneous camera shots to record, and how the tape would be edited. On similar facts, we held that a television station had not created a work for hire in *Easter Seal Soc. for Crippled Children and Adults of Louisiana, Inc. v. Playboy Enterprises*.[11]  In *Easter Seal*,

_____

[11] 815 F.2d 323 (5th Cir. 1987).

entertainer Ronnie Kole, acting on behalf of the Easter Seal Society, contracted with television station WYES to videotape a staged parade and musical jam session. WYES recorded the live performances on videotape, and its unit director Beyer controlled the videotaping by supervising all unit employees, "making the final aesthetic and technical decisions about the deployment of six video cameras and sound equipment."[12] Although Kole told Beyer in advance about musical arrangements "so that Beyer . . . could position his camera operators and tape appropriate shots of each band member," and made suggestions about certain camera angles,[13] we held that the Society's copyright claim failed because WYES was an independent contractor under the Copyright Act.[14]

Considering all the factors discussed above, we agree with the district court that KIII established as a matter of law that the personnel it supplied to videotape the concert were not employees of Quintanilla.

B. *Joint Ownership*

Appellants complain that the district court erred in rejecting their argument that their complaint alleged a claim under a theory of joint copyright ownership, and erred in denying

---

[12] *Id*. at 324.

[13] *Id*.

[14] *Id*. at 336. Our interpretation of the work for hire doctrine under the Copyright Act was essentially adopted by the Supreme Court in *Reid*. *See Easter Seal*, 815 F.2d at 334-36; *Reid*, 490 U.S. at 739, 750-52, 109 S. Ct. at 2172, 2178-79.

Quintanilla's motion for leave to amend to assert a joint ownership claim.[15]

Under the Copyright Act, a "joint work" is "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."[16]

We agree with the district court that appellants did not plead a federal cause of action based on a theory of joint copyright ownership.[17] "It is widely recognized that '[a] co-owner of a copyright must account to other co-owners for any profits he earns from the licensing or use of the copyright . . . .'"[18] While Quintanilla and the Songwriters pleaded copyright infringement, "'the duty to account does not derive from the copyright law's proscription of infringement. Rather, it comes from '. . . general principles of law governing the

_____

[15] Of the plaintiffs, Quintanilla alone sought leave to amend to add a joint ownership claim.

[16] 17 U.S.C. § 101.

[17] To the extent that appellants claim a joint ownership cause of action under state law (such as a breach of contract claim or claim for an accounting under a theory of unjust enrichment), they do not appeal the district court's decision to dismiss *all* the state law claims under 28 U.S.C. § 1367(c), providing that the district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."

[18] *Goodman v. Lee*, 78 F.3d 1007, 1012 (5th Cir. 1996) (quoting *Oddo v. Ries*, 743 F.2d 630, 633 (9th Cir. 1984)).

rights of co-owners.'"[19]   "A co-owner of a copyright cannot be liable to another co-owner for infringement of the copyright."[20] Further, the complaint throughout argued that plaintiffs' copyright interests were exclusive, inconsistent with a theory of joint ownership.

We also hold that the district court did not abuse its discretion in denying Quintanilla leave to amend to add a joint ownership claim.  This suit was filed in February of 1997.  At a May 8, 1997 pretrial hearing, counsel for appellants was equivocal as to whether he was asserting a claim of joint ownership.  Later, the court again asked counsel what his cause of action was, to which counsel stated that it was based on sole ownership of the copyright by Quintanilla.  Counsel also stated that he did not want to add any new causes of action, although the court repeatedly stated its view that the complaint did not assert a claim based on joint ownership.  KIII filed its summary judgment motion on May 28, after fairly extensive discovery that included the depositions of Quintanilla, Sanchez, and KIII's general manager.  On June 20, plaintiffs sought leave to amend to add a joint ownership claim as to Quintanilla, which the court denied.  At a July hearing on the summary judgment motion, the court noted that the complaint had not pleaded a joint ownership cause of action, and that at the last hearing counsel for

---

[19] *Goodman*, 78 F.3d at 1012 (quoting *Oddo*, 743 F.2d at 633)).

[20] *Oddo*, 743 F.2d at 632-33.

10

plaintiffs had stated that he did not want to add any new causes of action. Counsel for KIII argued that the summary judgment motion was prepared based on the pleadings on file.

"Whether leave to amend should be granted is entrusted to the sound discretion of the district court, and that court's ruling is reversible only for an abuse of discretion."[21] In ruling on a motion for leave to amend, the court may consider whether granting leave to amend would impose undue prejudice on the opposing party,[22] and whether the moving party failed to take advantage of earlier opportunities to amend.[23] Given the circumstances described above, we cannot say that the district court abused its discretion in denying leave to amend.[24]

_____

[21] *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993).

[22] *Louisiana v. Litton Mortgage Co.*, 50 F.3d 1298, 1303 (5th Cir. 1995).

[23] *Topalian v. Ehrman*, 954 F.2d 1125, 1139 (5th Cir. 1992).

[24] The judgment in the present case decides only Quintanilla's claim to sole ownership of the copyright. It does not decide his claim to joint ownership, which may be litigated in another case. The district court stated in its order granting summary judgment that KIII has sole copyright ownership. That holding is unnecessary to the order, and it was unwarranted by this record. In *Easter Seal*, we recognized that both the television station and the party who gave the musical performance might be joint owners of the copyright to the videotape. 815 F.2d at 337. The efforts of Quintanilla in staging and directing the concert, or the efforts of the band members in performing the concert, might entitle him to joint authorship status. Certainly, the performance by the band might itself be a work of authorship that would render the videotape a work of joint authorship, since copyright protection extends to "original works of authorship fixed in any tangible medium," and works of authorship include "musical works," "choreographic works," "audiovisual works" and "sound recordings." 17 U.S.C. § 102(a). KIII does not dispute that Quintanilla was the owner and manager

11

C.  *Transfer of Copyright*

Quintanilla argues that KIII's copyright interest in the videotape was transferred to him.  We agree with the district court that Quintanilla never pleaded such a theory.  Further, a transfer of copyright ownership "is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."[25]  Quintanilla produced no writing mentioning KIII's copyright interests in the videotape or purporting to convey such interests to Quintanilla.  Even as to their oral understandings, Quintanilla and Sanchez both testified that there was no discussion of who would own the copyright to the videotape.

_____

of the band.  Conceivably, the band members were his employees under the work for hire doctrine, or licensed or assigned their copyright interests in their performance at the concert to him.  Further, Quintanilla's own efforts in arranging the lighting, deciding which songs would be performed and in which order, deciding the forum, providing input on camera positions and shots, directing the band to replay certain songs, and perhaps other efforts might have involved sufficient creative input to entitle him to joint authorship status in his capacity as the director of the concert.  "To qualify for copyright protection, a work must be original to the author.  Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity.  To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice." *Feist Publications v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345, 111 S. Ct. 1282, 1287 (1991) (citations omitted).  On this record, we cannot say as a matter of law that Quintanilla's contributions were so minimal that he is not entitled to joint authorship status.  If, as *Easter Seal* recognizes, the director of a motion picture is afforded joint authorship status, we see no reason that the director of a musical performance might not also be entitled to such status.

[25] 17 U.S.C. § 204(a).

12

D.   *The Songwriters*

The Songwriters argue that they asserted a copyright infringement claim independent of the claim that the videotape was a work made for hire.  Perhaps the complaint asserted a claim that KIII had exceeded its limited license to use a derivative work of the Songwriters.  The complaint alleged that Quintanilla, on his own behalf and on behalf of the Songwriters, negotiated an agreement whereby KIII would have a limited nonexclusive license to play the videotape of the concert on the Domingo Show only, and that KIII exceeded the scope of the license.  While not using the term "derivative work," the complaint alleged that the concert videotape "was based entirely on pre-existing works," including the Songwriters' compositions, and that KIII infringed on the copyrights in their compositions.

A derivative work "is a work based upon one or more preexisting works, such as a . . . musical arrangement . . . or any other form in which a work may be recast, transformed, or adapted."[26]   Even if the videotape qualifies as an independent work of authorship entitled to copyright protection, it might also be a derivative work based in part on the underlying copyrighted songs performed at the concert.  By analogy, "'although a novelist, playwright, or songwriter may write a work with the hope or expectation that it will be used in a motion picture, this is clearly a case of separate or independent authorship rather than one where the basic intention behind the

---

[26] 17 U.S.C. § 101.

13

writing of the work was for motion picture use.  In this case, the motion picture is a derivative work within the definition of that term . . . .'"[27]

In contrast to co-owners of a joint work, who as explained above cannot sue each other for copyright infringement, the owner of a copyright can sometimes sue a party licensed to create a derivative work for copyright infringement.  If a songwriter grants a limited license restricting the use of a videotape of a concert in which the songwriter's copyrighted composition is performed, breach of the license agreement might constitute copyright infringement,[28] particularly where, as alleged here, the breach was material.[29]

However, to prevail on a copyright infringement claim the plaintiff must prove that he owned a copyright and that the defendant impermissibly copied or otherwise infringed upon the copyright.[30]  Plaintiffs offered no summary judgment proof that the songwriters were the current owners of copyrights in the songs that were performed at the concert.  Further, the Copyright Act provides that "no action for infringement of the copyright in

---

[27] 1 PAUL GOLDSTEIN, COPYRIGHT § 4.2.1 n.18 (2d ed. 1996) (quoting H.R. REP. NO. 94-1476, at 120 (1976).

[28] *See* 1, 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 3.07[A][1] (1997) (discussing *Gilliam v. American Broadcasting Cos.*, 538 F.2d 14 (2d Cir. 1976)) and § 10.15[A].

[29] GOLDSTEIN, *supra* n.27, at § 4.6.1; 3 NIMMER, *supra* n.28, at § 10.15[A].

[30] *DSC Communications Corp. v. DGI Techs., Inc.*, 81 F.3d 597, 600 (5th Cir. 1996).

14

any work shall be instituted until registration of the copyright claim has been made in accordance with this title."[31]  The Songwriters offered no summary judgment proof of copyright registration in the underlying songs.  The only copyright registration in the record is Quintanilla's registration for the copyright to the videotape.

AFFIRMED.

---

[31] 17 U.S.C. § 411(a).