**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

**No. 00-11174**

---

**LYN-LEA TRAVEL CORP.
d/b/a FIRST CLASS INTERNATIONAL TRAVEL MANAGEMENT,**

**Plaintiff-Counter-Defendant-Appellant,**

**v.**

**AMERICAN AIRLINES, INC.,**

**Defendant-Counter-Claimant–Appellee,**

**SABRE GROUP, INC.,**

**Intervenor Defendant-Counter-Claimant-Appellee.**

---

**Appeal from the United States District Court
for the Northern District of Texas**

---

February 13, 2002

Before JONES, SMITH and DeMOSS, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Lyn-Lea Travel, Inc. appeals an adverse judgment on its claims against American Airlines for reducing the profitability of a travel agent booking contract. The district court determined that the Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713(b)(1), preempted all of Lyn-Lea's state-law claims as well as Lyn-Lea's fraudulent inducement defense to a breach of contract counterclaim. On this major issue, we conclude that affirmative state law claims

against American are preempted, but that Lyn-Lea's defenses to its contract with American's subsidiary are not. A partial remand is required. The magistrate judge's rulings on procedural and sanctions issues are affirmed.

## I. Background

### A. Factual Background

Lyn-Lea is a travel agency formerly authorized to sell airline tickets for American pursuant to the terms of an Airline Reporting Commission Reporting Agreement (the "ARC Agreement"). The ARC Agreement required American to pay Lyn-Lea commissions for booking flights in accordance with American's published commission schedule. The ARC Agreement permitted American to modify its commission schedule at any time.

In 1994, Lyn-Lea purchased a competing travel agency, Air-O Travel. At the time of this purchase, Air-O Travel was contractually obliged to use American's computer reservation system (the "Sabre CRS"). In order to reduce the booking obligations assumed in the purchase of Air-O Travel, Lyn-Lea began negotiating a new CRS agreement with American, through American's Sabre Travel Information Network Division ("STIN"). On December 7, 1994, Lyn-Lea and American executed a new CRS lease agreement (the "Sabre Agreement"). The Sabre Agreement provided for Lyn-Lea's lease of four Sabre CRS terminals from STIN.[1] The Sabre Agreement also

---

[1] Sabre CRS terminals are required to book flights on American. The CRS terminals may also be used to reserve hotel rooms and rental cars.

2

released Lyn-Lea from Air-O Travel's prior CRS obligations, but required Lyn-Lea to use the Sabre CRS terminals for at least 1200 transactions per month.

On February 10, 1995, American announced modifications to its domestic commission schedule that dramatically reduced the commissions paid to travel agencies. Lyn-Lea's main contention in this lawsuit is that American knew, at the time it negotiated the Sabre CRS Agreement, that it was about to reduce commissions and should have disclosed the impending changes. Lyn-Lea contends that the new commission schedule severely damaged Lyn-Lea's business and prevented its fulfillment of the Sabre Agreement. Had Lyn-Lea known of the impending reductions in commissions, it would not have entered into the Sabre CRS Agreement.

On March 1, 1996, American sent Lyn-Lea an invoice for amounts due under the terms of the Sabre CRS Agreement. Lyn-Lea refused to pay. American terminated the agreement with Lyn-Lea, demanded full payment, and disconnected the CRS terminals leased by Lyn-Lea. Lyn-Lea allegedly lost several clients because it could no longer book American flights.

B.    Procedural Background

Lyn-Lea promptly filed suit against American seeking damages for tortious interference with business relationships, breach of contract, fraud, and violations of the Texas Deceptive Trade Practices Act. American counterclaimed for Lyn-Lea's alleged

3

breach of the Sabre CRS Agreement. On March 21, 1997, Lyn-Lea and American consented to trial before Magistrate Judge Boyle pursuant to 28 U.S.C. § 636.

American and Sabre[2] filed a joint motion for summary judgment arguing, inter alia, that Lyn-Lea's claims were preempted by the ADA. Lyn-Lea objected to Appellees' preemption argument on the ground that neither American nor Sabre had pleaded preemption as an affirmative defense. In response, American requested, and the magistrate judge approved, an amendment to its answer that properly pled preemption.

The magistrate judge granted summary judgment on all of Lyn-Lea's claims, finding insufficient evidence to support Lyn-Lea's breach of contract claim and preemption of its remaining claims by the ADA. In a later order, Lyn-Lea's fraudulent inducement defense to Sabre's counterclaim was also dismissed on the basis of ADA preemption. The only claim left for trial was Sabre's breach of contract counterclaim.

As the case went on, the court sanctioned Lyn-Lea and its counsel, Stephen Gardner, for violating protective orders relating to confidential documents produced during discovery. The court further penalized Gardner pursuant to 28 U.S.C. § 1927 for "unreasonably and vexatiously" multiplying court proceedings. Not

---

[2] Sabre Group, Inc. ("Sabre"), "spun-off" by American during the course of this litigation, was assigned all rights to the Sabre CRS Agreement. Sabre succeeded American as defendant and counter-plaintiff in this suit.

surprisingly, Lyn-Lea moved to rescind its consent to proceeding before the magistrate judge. Just as predictably, she refused relief.

The parties then settled Sabre's counterclaim. On September 28, 2000, the court entered an agreed Final Judgment subject to the court's resolution of Sabre's motion for attorney's fees. Sabre requested more than $280,000 in attorneys' fees for prosecution of its breach of contract claim and its defense against the related claims raised by Lyn-Lea. The magistrate judge awarded Sabre $123,933.69 in attorneys' fees plus $30,000 contingent upon Lyn-Lea's unsuccessful appeal.

Lyn-Lea now challenges the orders dismissing its claims and affirmative defense, the contempt and sanctions orders, the attorneys' fees award, and the orders granting leave to amend and denying Lyn-Lea's request to vacate its consent to trial before a magistrate.

## II. Discussion

### A. ADA Preemption

Lyn-Lea challenges the finding of ADA preemption on procedural and substantive grounds.

#### 1. Leave to Amend

"Whether leave to amend should be granted is entrusted to the sound discretion of the district court . . . ." Quintanilla v.

5

<u>Texas Television, Inc.</u>, 139 F.3d 494, 499 (5th Cir. 1998). Federal Rule of Civil Procedure 15(a) requires the trial court to grant leave to amend "freely," and the language of this rule "evinces a bias in favor of granting leave to amend." <u>Chitimacha Tribe of La. v. Harry L. Laws Co., Inc.</u>, 690 F.2d 1157, 1162 (5th Cir. 1983). The district court must have a "substantial reason" to deny a request for leave to amend. <u>Jamieson v. Shaw</u>, 772 F.3d 1205, 1208 (5th Cir. 1985). Notwithstanding these authorities, Lyn-Lea contends that the trial court erred by granting the defendants leave to amend their pleadings because they did not "establish[] good cause or any justification for filing amended pleadings long after the deadline for [pleading amendments] had expired." Lyn-Lea's argument is unpersuasive. Preemption is an issue of law whose relevant facts were undisputed in this case. Lyn-Lea was not deprived of discovery. Consequently, the trial court did not abuse its discretion in granting leave to amend. <u>Quintanilla</u>, 139 F.3d at 499.

### 2. ADA Preemption[3]

The ADA is an economic deregulation statute intended to encourage maximum reliance on competitive market forces in the airline industry by freeing airlines from restrictive state regulation. <u>Hodges</u>, 44 F.3d at 335-36. The statute broadly prevents states from interfering with this goal:

---

[3] The district court's summary judgment order is reviewed *de novo*. <u>Hodges v. Delta Airlines, Inc.</u>, 44 F.3d 334, 335 (5th Cir. 1995) (en banc).

6

> Except as provided in this subsection, a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1).[4]

The Supreme Court has twice addressed ADA preemption. See Morales v. Trans World Airlines, Inc., 504 U.S. 374, 112 S.Ct. 2031 (1992); American Airlines, Inc. v. Wolens, 513 U.S. 219, 115 S.Ct. 817 (1995). In Morales, the Court explained that the scope of ADA preemption is a question of statutory intent. 504 U.S. at 383, 112 S.Ct. at 2036. Relying on its prior interpretation of similar preemptive language in the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1144(a),[5] the Court held that the phrase "relating to rates, routes, or services" in the ADA was "deliberately expansive" and preempted any "[s]tate enforcement action having a connection with or reference to airline 'rates, routes, or services.'" Morales, 504 U.S. at 384, 112 S.Ct. at 2037 (citations omitted). The Court observed that "some state actions may affect airline fares in too tenuous, remote, or peripheral a manner to have preemptive effect." Id. at 390, 112 S.Ct. at 2040. However, the ADA preempts any state action having

---

[4]    This clause was originally codified at 49 U.S.C. § 1305(a). In 1994, Congress recodified § 1305(a), and the clause is now found at 49 U.S.C. § 41713(b)(1). As part of the recodification, Congress changed the phrase "rates, routes, or services" to "price, route, or service." Congress did not intend this modification to substantively change existing law. See H. Conf. Rep. No. 677, 103rd Cong., 2nd Sess. 83-84 (1994).

[5]    ERISA preempts state laws "insofar as they . . . relate to any employee benefit plan." 29 U.S.C. § 1144(a).

7

a "forbidden significant effect upon [airline] fares." Id. at 388, 112 S.Ct. at 2039-40.

In Wolens, the Court expanded upon ADA preemption as a device to protect the deregulation of the airline industry by preventing "application of restrictive state laws." 513 U.S. at 228, 115 S.Ct. at 824. Nevertheless, "the ADA's preemption clause [does not] shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings." Id. The ADA does not preempt "state-law-based court adjudication of routine breach-of-contract claims" so long as there is "no enlargement or enhancement [of the contract] based on state laws or policies external to the agreement." Id. at 232-33, 115 S.Ct. at 826.

This court has also addressed the scope of ADA preemption, holding that the ADA does not preempt state tort actions alleging personal injury resulting from the operation of an aircraft. Hodges, 44 F.3d at 340.[6] Other provisions of the ADA require airlines to maintain personal injury and property damage insurance coverage for claims resulting from operation of the

---

[6] In support of its holding, the court relied on the ADA's legislative history and cited the following comments made by the Civil Aeronautics Board regarding the scope of ADA preemption: "preemption extends to all of the economic factors that go into the provision of the quid pro quo for passenger's [sic] fare, including . . . reservation and boarding practices . . . ." Hodges, 44 F.3d at 337 (citing 44 Fed. Reg. 9948, 9951 (Feb. 15, 1979)).

8

aircraft.  Consequently, ADA preemption is "concerned solely with economic deregulation, not with displacing state tort law."  Id. at 337.[7]

Unlike the personal injury claims in Hodges, which were unrelated to economic deregulation, Lyn-Lea's claims for affirmative relief have a significant relationship to the economic aspects of the airline industry.  Lyn-Lea asserts that (1) American intentionally interfered with its business relationships with four customers and an employee, luring the customers away with discounted fares; and (2) American acted fraudulently and deceptively while negotiating the Sabre CRS agreement with Lyn-Lea.  The first claim involves American's dealings with customers, while the second relates to enforceability of the Lyn-Lea contract.  In other words, by its first claim, Lyn-Lea is seeking the application of Texas common law in a way that would regulate American's pricing policies, commission structure and reservation practices.[8]

A very narrow reading of Wolens might be said to support Lyn-Lea's position, at least as it pertains to claims of fraud

---

[7]    See also, Smith v. America West Airlines, Inc., 44 F.3d 344 (5th Cir. 1995) a companion case to Hodges involving a state tort claim brought against an airline for negligently allowing a hijacker to board a plane).

[8]    Lyn-Lea also argues, without citing supporting authority, that its claims against Sabre cannot be preempted because Sabre is not an air carrier. ADA preemption is not limited to claims brought directly against air carriers. See Huntleigh Corp. v. La. State Bd. of Private Security Examiners, 906 F.Supp. 357, 362 (M.D. La. 1995); Continental Airlines, Inc. v. American Airlines, Inc., 824 F.Supp. 689, 696-97 (S.D. Tex. 1993); Marlow v. AMR Services Corp., 870 F.Supp. 295, 297-98 (D. Haw. 1991).  Rather, claims are preempted if they "relate to" the prices, routes or services of an air carrier.

9

regarding the Sabre contract negotiations. (The interference with business relations claim is plainly preempted because it involves American's prices and services to customers.) <u>Wolens</u> specifically preempted a consumer fraud statute, while Lyn-Lea rests its claim on state common law and, even more narrowly, on fraud related to the making of the contract.[9] And <u>Wolens</u> concerned programs run by the airline directly with consumers, whereas the contract dispute here pits American/Sabre against a travel agency; Lyn-Lea thus argues that American's "services" were too peripherally affected by a travel agent controversy to be preempted.

Although <u>Wolens</u> might be interpreted to permit the litigation of extra-contractual common law business torts that do not directly involve airline passengers, we think the better reading of the decision requires preemption. The majority opinion repeatedly singles out common law contract actions as not being preempted, notwithstanding complaints by both dissenters that contract and fraud-based claims often overlap. See <u>Wolens</u>, 513 U.S. at 236, 247-49, 115 S.Ct. at 827-28, 832-34 (Stevens, J., and O'Connor, J., separately dissenting). <u>Wolens</u> also expresses the ADA's purpose "to leave largely to airlines themselves, <u>and not at all to States</u>, the selection and design of market mechanisms appropriate to the furnishing of airline transportation services .

---

[9] Lyn-Lea admits that <u>Wolens</u>' reading of the ADA preempts its claims founded on the Texas Deceptive Trade Practices Act.

10

. . ." <u>Id.</u> at 227, 115 S.Ct. at 823 (emphasis added). While some airline business dealings undoubtedly do not "relate to" prices, routes and services, the carrier's relations with travel agents, as intermediaries between carriers and passengers, plainly fall within the ADA's deregulatory concerns. Lyn-Lea's claims are ADA-preempted because they have a "connection with" American's prices and services.

Even before <u>Wolens</u>, it was held that similar claims are preempted by the ADA. In <u>Frontier Airlines, Inc. v. United Air Lines, Inc.</u>, 758 F.Supp. 1399 (D. Col. 1989), the court held that the ADA preempted an action based on Colorado law alleging that United Airlines interfered with business relationships by requiring the use of a United-owned CRS system to book flights. The court determined that the CRS system was central to United's services because United required use of the CRS system to book flights. Similarly, American requires use of the Sabre CRS system to book flights, and American's policies relating to the CRS system are connected with the economic aspects of its services. <u>Frontier</u>, 758 F.Supp. at 1407-09.

The existence of federal regulations regarding airline CRS services and the legislative history of the ADA provide additional support for the conclusion that the ADA preempts Lyn-Lea's claims. The Department of Transportation, pursuant to regulatory authority under the ADA, has promulgated regulations

11

applicable to airline CRS systems. See 14 C.F.R. § 255 et seq.[10]
"[F]ederal efforts to regulate CRS services and uses clearly
demonstrate[] that the preemption statute should be applied to
eliminate the risk that CRS providers could be subject to varying
state standards of unlawful competition." Frontier, 758 F.Supp. at
1409. The ADA's legislative history also specifically discusses
federal regulation of airline CRS services, and this provides
"clear and convincing evidence that Congress intended to preempt
state law in the regulation of CRS services . . . ." Id. at 1408-
09 (quoting H.R.Rep. No. 98-793, at 4 (1984), reprinted in 1984
U.S.C.C.A.N. 2857).[11]

---

[10]     14 C.F.R. § 255.1(a) provides:

The purpose of [this section] is to set forth requirements for the
operation by air carriers and their affiliates of computer
reservation systems used by travel agents so as to prevent unfair,
deceptive, predatory, and anticompetitive practices in air
transportation.

[11]     Lyn-Lea argues that because CRS systems are not "unique" to the
airline industry, they are not airline "services" preempted by the ADA. Hodges
defined "services" preempted by the ADA as follows:

"Services" generally represent a bargained-for or anticipated
provision of labor from one party to another. . . . Elements of the
air carrier service include such items as ticketing, boarding
procedures, provision of food and drink, and baggage handling, in
addition to the transportation itself. These matters are all
appurtenant to and necessarily included with the contract of
carriage between the passenger or shipper and the airline. It is
these contractual features of air transportation that we believe
Congress intended to de-regulate as "services" and broadly protect
from state regulation.

Hodges, 44 F.3d at 336 (citation omitted). There is no requirement of uniqueness
in this definition of services. Rather, "[p]reemption extends to all of the
economic factors that go into the provision of the *quid pro quo* for passenger's
[sic] fare, including flight frequency and timing, liability limits, reservation
and boarding practices, insurance, smoking rules, meal service, entertainment,
bonding and corporate financing." Id. at 337 (citation omitted).

Finally, Lyn-Lea's claims do not seek to enforce American's self-assumed contractual obligations. Lyn-Lea's breach of contract claim was dismissed by the magistrate judge on other grounds, and Lyn-Lea has not appealed the ruling. Because Lyn-Lea's claims relate to American's prices and services, the claims are preempted by the ADA.

### 3. Preemption of Lyn-Lea's Affirmative Defense

Lyn-Lea next contends that the trial court erred by dismissing, as preempted, its fraudulent inducement defense to the enforcement of the Sabre CRS agreement.[12] Noting that <u>Wolens</u> confined courts "to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement," the court determined that Lyn-Lea's fraudulent inducement defense would impermissibly enhance Lyn-Lea's rights apart from the Sabre CRS agreement under state law. Indeed, <u>Wolens</u> cautioned, when it decided that enforcement of air carriers' contracts is not preempted, "'some state-law principles of contract law . . . might well be preempted to the extent they seek to effectuate the State's public policies, rather than the intent of

---

[12] Lyn-Lea contends that three of its affirmative defenses (fraudulent inducement, breach of the duty of good faith and fair dealing, and estoppel) were improperly dismissed on the basis of ADA preemption. The court determined that the breach of the duty of good faith and fair dealing and estoppel defenses had been insufficiently pleaded and dismissed both defenses. Lyn-Lea has not challenged this ruling. Therefore, Lyn-Lea's fraudulent inducement defense is the only defense dismissed on the basis of preemption.

13

the parties.'" <u>Wolens</u>, 513 U.S. at 233 n.8, 115 S.Ct. at 826. We disagree, however, with the magistrate judge's conclusion that Lyn-Lea's fraudulent inducement defense attempts to enhance or enlarge the Sabre CRS Agreement on the basis of state policies external to the agreement.

When pleaded as a defense to a contract, fraudulent inducement is related to the fundamental issue in contract actions: is there an enforceable agreement? A fraudulently induced party has not assented to an agreement because the fraudulent conduct precludes the requisite mutual assent. <u>See</u> RESTATEMENT (SECOND) OF CONTRACTS § 164 (1979). Fraudulent inducement is an elementary concept in the law of contracts, and is intended to shield a party from liability in a contract action only when another party has procured the alleged contract wrongfully. <u>United States v. Texarkana Trawlers</u>, 846 F.2d 297, 304 (5th Cir. 1988). The Court reasoned in <u>Wolens</u> that because contract law is, at its "core," uniform and non-diverse, there is little risk of inconsistent state adjudication of contractual obligations. 513 U.S. at 219 n.8, 115 S.Ct. at 826. Fraudulent inducement is among those core concepts as it relates to the validity of mutual assent. The defense does not reflect a state policy seeking to expand or enlarge the

14

parties' agreement.  Therefore, Lyn-Lea's fraudulent inducement defense is not preempted by the ADA.[13]

### B.    Sanction Orders

#### 1.    Sanctions for Violations of Court Orders

Relying on the magistrate judge's factual findings and recommendations, the district court sanctioned Lyn-Lea and Stephen Gardner, Lyn-Lea's counsel, for violating three protective orders relating to confidential documents obtained during discovery.  The magistrate judge found that Stephen Sedgewick, President of Lyn-Lea, had violated the protective orders by revealing the contents of sealed documents to the press.  This finding was based on Sedgewick's own testimony.[14]  The magistrate judge also recommended a finding of contempt against Gardner for filing a complaint with the Department of Transportation ("DOT") that quoted portions of the sealed documents and thus expressly violated the court's June 3, 1998 protective order.  Gardner acknowledged his inadvertent violation of this order.  The magistrate judge recommended entry of a sanction of $18,404 against Lyn-Lea and Gardner, jointly and severally, "which amount is the total of all the costs, attorneys'

---

[13]    Sabre urges this court to hold that summary judgment should have been granted against Lyn-Lea's fraud claims, whether raised affirmatively or defensively.  The magistrate judge did not address the merits of this issue.  It is prudent to remand for initial consideration in the court most familiar with this case.

[14]    Sedgwick admitted that he spoke with 30 or 40 reporters during the course of this litigation.  Sedgwick was quoted in one publication regarding the contents of sealed documents, and Sedgwick acknowledged making such statements.

15

fees and expenses incurred by Defendants in attempting to obtain the compliance of Plaintiff and its representatives with the terms of the protective orders . . . ." Following review of the magistrate judge's findings and recommendations and a *de novo* hearing, the district court found Lyn-Lea and Gardner in contempt and adopted the magistrate judge's recommendations.

Lyn-Lea argues that the district court erred in characterizing the contempt orders as civil rather than criminal in nature. Criminal contempt proceedings require heightened notice and proof, which Lyn-Lea contends were not satisfied in this case. Even if the contempt proceeding is civil in nature, Lyn-Lea argues that the contempt order is not supported by sufficient evidence. Finally, Lyn-Lea contends that it was error to find Gardner jointly and severally liable for the full amount of the contempt award in light of his limited role in the contemptuous conduct.

A contempt order is reviewed for abuse of discretion, and underlying factual findings are reviewed for clear error. FDIC v. LeGrand, 43 F.3d 163, 165 (5th Cir. 1995). A contempt order is civil in nature if the purpose of the order is (1) to coerce compliance with a court order or (2) to compensate a party for losses sustained as a result of the contemnor's actions. Crowe v. Smith, 151 F.3d 217, 227 (5th Cir. 1998) (citing Int'l Union, United Mine Workers of America v. Bagwell, 512 U.S. 821, 829, 114 S.Ct. 2552 (1994)). The contempt award entered by the district

16

court was intended to compensate Appellees for the costs they incurred in attempting to obtain Lyn-Lea's compliance with the court's protective orders. Therefore, the challenged order is civil in nature, and the heightened procedural requirements attendant to a criminal contempt proceeding are inapplicable.

A party seeking a civil contempt order must demonstrate, by clear and convincing evidence, "(1) that a court order was in effect, (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order." LeGrand, 43 F.3d at 170 (citing Martin v. Trinity Indus., Inc., 959 F.2d 45, 47 (5th Cir. 1992)); Whitfield v. Pennington, 832 F.2d 909, 913 (5th Cir. 1987). Lyn-Lea does not dispute that the court entered three protective orders relating to confidential documents that were in effect at the time of Sedgwick's and Gardner's actions. However, Lyn-Lea asserts that the orders merely prohibited disclosure of the confidential documents but did not prohibit disclosure of the contents of such documents. Lyn-Lea argues that there is insufficient evidence supporting the contempt order because Appellees "declined to identify a single confidential document disclosed in Lyn-Lea's discussions with the press."

Lyn-Lea's argument is disingenuous. The magistrate judge rejected this argument in her contempt findings, correctly reasoning that Lyn-Lea's reading of the protective orders would

17

render them a nullity.  The court's protective orders prohibited the use of the confidential documents for any purpose outside of the litigation, thereby prohibiting revelation of the documents' contents as much as their existence.  Sedgwick's and Garner's admissions constitute clear and convincing evidence that Lyn-Lea and Gardner violated the court's protective orders.  The district court did not abuse its discretion by entry of the contempt order.

## 2.    Section 1927 Sanctions

The order sanctioning Gardner for "unreasonably and vexatiously" multiplying proceedings pursuant to 28 U.S.C. § 1927 is reviewed for abuse of discretion.  Matta v. May, 118 F.3d 410, 413 (5th Cir. 1997).[15]  All that is required to support § 1927 sanctions is a determination, supported by the record, that an attorney multiplied proceedings in a case in an unreasonable manner.  Browning v. Kramer, 931 F.2d 340, 344 (5th Cir. 1991).

The magistrate judge determined that Gardner unreasonably multiplied proceedings by appearing at the scheduled contempt hearing without Sedgwick, a necessary witness.  Gardner contends that he did not understand the nature of the hearing in question, and was prepared to proceed without Sedgwick.  The magistrate judge

---

[15]    Section 1927 provides:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

18

rejected this contention, concluding that Gardner was aware that the purpose of the hearing was to determine if Sedgwick should be held in contempt for his statements to the press, and that Gardner's attempt to justify the absence of Sedgwick "wholly lack[ed] credibility." The absence of Sedgwick made it necessary to reschedule the hearing at a later date, thus multiplying proceedings. The magistrate judge did not abuse her discretion in her § 1927 sanction order.

## C.    Section 636(c) Consent

Lyn-Lea next contends that the court erred by denying its motion, filed almost two years after it consented to proceed before a magistrate judge, seeking to rescind its consent. Lyn-Lea argues that its consent was expressly conditioned on its right to appeal to a district judge rather than this court. This court has warned that it will not countenance any rule allowing a party to "express conditional consent" to trial before a magistrate. Carter v. Sealand Services, Inc., 816 F.2d 1018, 1020 (5th Cir. 1987). A referral may only be vacated upon a showing of "extraordinary circumstances". 28 U.S.C. § 636(c)(4). Appellant presented no evidence of any extraordinary circumstances. Therefore, the Magistrate did not abuse her discretion by denying Lyn-Lea's motion to vacate the 636 referral. Carter, 816 F.2d at 1021.

19

### D. Attorneys' Fees

After the court entered its summary judgment and contempt orders, the only issue remaining was Sabre's breach of contract counterclaim. Sabre and Lyn-Lea agreed to the entry of a $30,000 judgment on this claim, reserving the right to appeal the court's prior rulings. Sabre, as the prevailing party on its written contract, sought an award of $282,030.61 in attorneys' fees plus an additional $30,000 in fees contingent on Lyn-Lea's unsuccessful appeal. In support of its fee request, Sabre submitted the affidavits of two of its attorneys summarizing the number of hours expended on the litigation and the reasonableness of the fees sought. Redacted billing statements containing only the date and number of hours worked with no description of the nature of the work were attached to the affidavits.

In a detailed opinion, the magistrate judge awarded Sabre $123,933.69 plus $30,000 in contingent appellate fees. Lyn-Lea now challenges this award, arguing that (1) Sabre offered insufficient evidence to support the fee award, (2) Sabre failed to segregate hours expended on prosecution of its counterclaim from hours expended in defense of Lyn-Lea's claims, (3) the fee award includes fees incurred prior to Sabre's intervention in this suit, (4) the amount of the award is excessive in light of Sabre's limited recovery, (5) the Johnson factors do not support the amount of the

award, and (6) the amount of contingent appellate fees is excessive.

The short answer regarding the fee award is that we have carefully considered Lyn-Lea's arguments opposing the amount, reasonableness, and documentation of the fee award and find no error of Texas law, clear error of fact or abuse of discretion. See Northwinds Abatement, Inc. v. Employers Ins. of Wausau, 258 F.3d, 345, 353 (5th Cir. 2001); Tex. Civ. Prac. & Rem. Code § 38.001; Hon. Scott A. Brister, Proof of Attorney's Fees in Texas, 24 St. Mary's L.J. 313 (1993). Nevertheless, on the basis of our ruling regarding Sabre's contract claim, we must vacate the award and remand for reconsideration after the magistrate judge reassesses Sabre's contract claim in light of Lyn-Lea's non-preempted defense.

## Conclusion

Lyn-Lea's affirmative non-contractual claims against American are preempted by the ADA. However, Lyn-Lea's fraudulent inducement defense to enforcement of its contract with Sabre is not preempted. The judgment on the contract and associated attorneys' fee award must accordingly be vacated and remanded for further proceedings. The contempt and sanction orders are affirmed.

Judgment for Sabre on Contract and Attorney's Fees **VACATED** and **REMANDED**.

Contempt order **AFFIRMED**.

21

Sanction order **AFFIRMED.**