REVISED January 31, 2012

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 30, 2012

Lyle W. Cayce
Clerk

No. 11-20264

In the Matter of: CAPCO ENERGY INCORPORATED; AMCO ENERGY,
INCORPORATED

Debtors

-------------------------------------------------------------------------------------------------------------

AMCO ENERGY, INCORPORATED, formerly known as Capco Offshore,
Incorporated; CAPCO ENERGY INCORPORATED

Appellants

v.

TANA EXPLORATION COMPANY; TRT HOLDINGS, INCORPORATED;
TRISTONE CAPITAL, LLC; RYDER SCOTT COMPANY, L.P.

Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before CLEMENT, OWEN, and HIGGINSON, Circuit Judges.

HIGGINSON, Circuit Judge:

In a bankruptcy adversary proceeding, Amco Energy, Inc., f/k/a Capco
Offshore, Inc., and Capco Energy, Inc. (together, "Capco") brought claims of

fraud and various business torts against Ryder Scott Company, L.P. ("Ryder"), Tana Exploration Company, LLC ("Tana"), TRT Holdings, Inc. ("TRT"), and Tristone Capital, LLC ("Tristone"). The claims arise out of a transaction in which Capco purchased from Tana certain oil and gas reserves located in the Gulf of Mexico. The bankruptcy court granted summary judgment in favor of Ryder, Tana, TRT, and Tristone and dismissed the claims. For the following reasons, we affirm the district court's affirmance of the bankruptcy court's ruling.

## FACTS AND PROCEEDINGS

In early 2006, Tana decided to sell certain oil and gas properties located in the Gulf of Mexico (the "Properties"). Tana engaged Tristone to serve as its financial advisor and agent in marketing and selling the Properties. Tana also retained Ryder to review geological and engineering data, accounts, records, and other data in order to prepare a report estimating the reserves, future production, and income attributable to the Properties as of April 1, 2006 (the "April 1, 2006 Report"). Tristone utilized data provided by Tana, including well logs, histories, operations data, production, revenues, and the April 1, 2006 Report, to conduct its commercial evaluation of the Properties and prepare a Confidential Evaluation Brochure ("CEB") for parties interested in placing a bid to purchase the Properties.

The CEB made clear that Tana and Tristone disclaimed any warranty as to the accuracy, completeness, or materiality of the information or data contained in the CEB. In particular, the CEB stated that, "[a]ny financial forecasts in this Evaluation Brochure and accompanying materials are based on several estimates and assumptions that are subject to uncertain economic and

2

competitive pressures, including future business decisions that are subject to change." The CEB urged prospective purchasers to conduct their own independent investigation and analysis of the Properties and the data set forth in the CEB.

In order to receive the information regarding the Properties, Capco signed a confidentiality agreement on April 11, 2006. In addition to promising not to disclose information categorized as confidential, Capco accepted Tana's express and highlighted disclaimer of any responsibility for the accuracy of the information Capco received. Capco also agreed that it would "rely solely on its own independent evaluation and analysis of the Information when deciding whether or not to submit a bid or offer, enter into a definitive agreement or consummate any Transaction covering one or more of the Properties."

On May 3, 2006, Capco submitted a successful bid to purchase the Properties. Capco acknowledged that its bid was subject to "deal points" attached to the CEB. One specific deal point was that, "neither [Tana] nor [Tristone] make any representation or warranty as to the accuracy, completeness or materiality of any information or data (written or oral) that may be furnished to [Capco] in connection with this proposed transaction. In entering into this transaction, [Capco] will rely solely on its independent investigation of the Properties."

Following Tana's acceptance of Capco's bid, the parties engaged in lengthy negotiations to draft a Purchase and Sale Agreement ("PSA"). The parties executed the PSA on June 2, 2006. The PSA specifically provided:

> SELLER HEREBY EXPRESSLY NEGATES AND DISCLAIMS, AND BUYER HEREBY WAIVES, AND ACKNOWLEDGES THAT SELLER HAS NOT MADE, ANY REPRESENTATION OR WARRANTY, EXPRESS OR

IMPLIED, RELATING TO (a) THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY INFORMATION, DATA OR OTHER MATERIALS (WRITTEN OR VERBAL) NOW, HERETOFORE, OR HEREAFTER FURNISHED TO BUYER BY OR ON BEHALF OF SELLER OR (b) PRODUCTION RATES, RECOMPLETION OPPORTUNITIES, DECLINE RATES, GEOLOGICAL OR GEOPHYSICAL DATA OR INTERPRETATIONS, THE QUALITY, QUANTITY, RECOVERABILITY OR COST OF RECOVERY OF ANY HYDROCARBON RESERVES, ANY PRODUCT PRICING ASSUMPTIONS, OR THE ABILITY TO SELL OR MARKET ANY HYDROCARBONS AFTER CLOSING.

Furthermore, Capco represented that in making the decision to enter the agreement and consummate the transactions contemplated, it had relied solely on the basis of its own independent due diligence investigation of the Properties and not on any representations or warranties outside of the PSA.

On June 4, 2006, Ilyas Chaudhary, an employee with Capco, sent an e-mail to Pat McInturff, an employee with Ryder, informing Ryder that Capco had executed a PSA to purchase the Properties. The e-mail also stated, "Union Bank of California will tentatively fund this acquisition. They have requested a meeting in Houston with [Ryder] engineers to revisit Tana & Capco properties. (I believe to determine the loan values)."[1] Consistent with this lender request, five days later, a meeting occurred on June 9, 2006, with representatives from

---

[1] Capco had previously contracted Ryder to perform an analysis of Capco's existing oil and gas reserves as of December 31, 2005 (the "December 31, 2005 Report"). The contract specified that: (1) the evaluation would encompass both Capco's existing properties as well as properties Capco contemplated acquiring at the time; (2) a preliminary evaluation would take over two months to complete; (3) the estimated cost of Ryder's services would be between $25,000 and $35,000, with $12,500 due immediately before Ryder's work would commence; and (4) Capco would furnish to Ryder several batches of data, including production and geological data.

Ryder, Union Bank of California ("UBOC"), and Capco in attendance. Two representatives from Ryder, Olga Basanko and Pat McInturff, made a presentation regarding the Properties, which, according to a Capco attendee, included a detailed review of the April 1, 2006 Report Ryder had prepared for Tana. Following the meeting, Ryder sent an invoice to Capco in the amount of $2,032.50 for "services rendered in connection with the review of [Capco's] reserves and the Tana Acquisition Reserves with Union Bank of California." Capco paid the invoice.

In preparation for the closing of the transaction scheduled for August 31, 2006, a closing statement was sent to Capco on August 28, 2006, in accordance with the PSA. The closing statement provided Capco with a list of adjustments to the purchase price, including a credit to Capco for approximately $20 million in net production revenue that had accrued since April, 2006. The closing statement also included a footnote: "The August revenue (estimated at $6 million) will be forwarded upon receipt as well. The majority of the August revenue will be received the last week of September."

Capco's acquisition of the Properties closed on August 31, 2006.

Months later, in early 2007, Capco hired Ryder to prepare an estimate of the remaining volumes of oil and gas reserves, future production, and income attributable to the Properties as of December 31, 2006 (the "December 31, 2006 Report"). Capco claims that the December 31, 2006 Report indicated that reserves on a majority of the Properties were less than reflected on the earlier April 1, 2006 Report.

On April 7, 2008, Capco filed for bankruptcy protection under Chapter 11. On August 28, 2008, Capco filed an adversary proceeding in the U.S. Bankruptcy Court for the Southern District of Texas against Ryder, Tana, TRT, and Tristone

seeking rescission of the bill of sale and damages. Capco alleged that Ryder breached its professional obligations in its alleged contract with Capco. Capco also alleged that Tana, TRT, and Tristone made fraudulent representations regarding the Properties.

On June 13, 2011, the bankruptcy court granted summary judgment in favor of Ryder, Tana, TRT, and Tristone. The bankruptcy court ruled that Capco had failed to raise a genuine issue of material fact with respect to whether Capco's engagement of Ryder for the June 9, 2006 presentation was an implied contract creating a duty on Ryder to advise Capco regarding the purchase of the Properties. Because Capco conceded that all of its claims against Ryder were contingent upon a contract between Capco and Ryder, the bankruptcy court dismissed Capco's claims against Ryder. The bankruptcy court also ruled that Capco had failed to raise a genuine issue of material fact with respect to whether it had relied on the alleged misrepresentations made by Tana, TRT, and Tristone. Accordingly, the bankruptcy court dismissed Capco's remaining claims against Tana, TRT, and Tristone.

In a written decision, the district court affirmed the judgment of the bankruptcy court. Amco Energy, Inc.; fka Capco Offshore, Inc., et al, v. Tana Exploration Co., et al, No. 10-CV-3846, slip op. at 9 (S.D. Tex. Mar. 24, 2011)

## STANDARD OF REVIEW AND APPLICABLE LAW

We review the district court's decision using the same standard of review that the district court applied to the bankruptcy court's decisions. See Wells Fargo Bank of Texas N.A. v. Sommers (In re Amco Ins.), 444 F.3d 690, 694 (5th Cir. 2006). We review de novo a bankruptcy court's grant of summary judgment.

Ingalls v. Erlewine (In re Erlewine), 349 F.3d 205, 209 (5th Cir. 2003). A bankruptcy court's grant of summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id. (citing Fed. R. Civ. P. 56(c); Bankr. R. 7056).[2]

## DISCUSSION

### A. Capco's claims against Ryder

On appeal, Capco argues that Capco and Ryder entered into an implied contract whereby Ryder was to conduct an independent re-evaluation of the Properties and advise Capco regarding its closing on the Properties, and that Ryder breached its professional responsibility and caused Capco financial harm because Ryder's representations at the June 9, 2006 meeting regarding the accuracy of the reserve estimates allegedly were erroneous. Capco contends that its June 4, 2006 e-mail invitation to, and then the June 9, 2006 lender meeting with, Ryder representatives, along with its subsequent payment for the meeting, sufficiently demonstrate that it impliedly had contracted Ryder to advise it with respect to its earlier purchase but prior to closing. Capco further contends that, based on such implied contract, it had a right to rely on representations made

---

[2] Ryder argues that this court lacks jurisdiction over this appeal because Capco failed to comply with Federal Rule of Appellate Procedure 3(c)(1)(C), which requires an appellant to "name the court to which the appeal is taken." Fed. R. App. P. 3(c)(1). Generally, if there is only one court to which appellant can appeal, we have forgiven a party's failure to name this court as the court to which the appeal is taken. See e.g., United States v. Cantwell, 470 F.3d 1087, 1088 (5th Cir. 2006) (finding this element of Rule 3 met where only one avenue of appeal exists); McLemore v. Landry, 898 F.2d 996, 999 (5th Cir. 1990) (same). But see United States v. Pulgarin-Ospina, 182 F.3d 913, at *2 (5th Cir. 1999) (unpublished table decision) (dismissing appeal for failure to name court to which defendant was appealing). Rule 3 must be liberally construed in favor of appeals. Smith v. Barry, 502 U.S. 244, 248 (1992). We find Capco's notice of appeal sufficient to satisfy the requirements of Rule 3(c)(1).

by Ryder regarding the accuracy of reserve estimates in its April 1, 2006 Report. Because Ryder's reserve estimates allegedly were incorrect, Capco claims Ryder committed professional negligence by representing that Capco could rely on the figures.[3]

Under Texas law, "[t]o establish liability for professional negligence, [a] plaintiff must show the existence of a duty, a breach of that duty, and damages arising from the breach." Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 314 (5th Cir. 2002). "'The threshold inquiry in a negligence case is duty.'" Id. (quoting Greater Houston Transp. Co. v. Phillips, 801 S.W.2d 523, 525 (Tex. 1990)); see also Banc One Capital Partners Corp. v. Kneipper, 67 F.3d 1187, 1198-99 (5th Cir. 1995). "The duty owed by a professional to his client derives from their contractual relationship and requires that the professional 'use the skill and care in the performance of his duties commensurate with the requirements of his profession.'" Fed. Sav. and Loan Ins. Corp. v. Texas Real Estate Counselors, Inc., 955 F.2d 261, 265 (5th Cir. 1992) (citing and quoting I.O.I. Sys., Inc. v. City of Cleveland, Texas, 615 S.W.2d 786, 790 (Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.)); Dukes v. Philip Johnson/Alan Ritchie Architects, P.C., 252 S.W.3d 586, 594 (Tex. App.—Fort Worth 2008, pet. denied), cert. denied, 129 S. Ct. 1032 (2009).

"[A] binding contract requires '(1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each

---

[3] The bankruptcy court dismissed all of Capco's claims against Ryder, including claims of statutory fraud, common law fraud and fraudulent inducement, fraud by non-disclosure, negligent misrepresentation, and deceptive trade practices. On appeal, however, Capco only addresses the dismissal in the context of its professional negligence claim. Therefore, we only address Capco's arguments with respect to Capco's professional negligence claim.

party's consent to the terms; and (5) execution and delivery of the contract with intent that it be mutual and binding.'" Coffel v. Stryker Corp., 284 F.3d 625, 640 n.17 (5th Cir. 2002) (quoting Copeland v. Alsobrook, 3 S.W.3d 598, 604 (Tex. App. 1999)). "The determination of a meeting of the minds, and thus offer and acceptance, is based on the objective standard of what the parties said and did and not on their subjective state of mind. Additionally, consideration is a fundamental element of any valid contract." Copeland, 3 S.W.3d at 604 (citations omitted).

The parties do not dispute that a contract existed between Capco and Ryder for Ryder to appear at the June 9, 2006 meeting. The issue before this court is whether Capco presented evidence to demonstrate a genuine issue of material fact about whether Ryder was contracted to provide an independent re-evaluation of the Properties and advice at the meeting regarding Capco's decision to close on the Properties. The extent of Capco's relevant summary judgment evidence is: (1) Capco's June 4, 2006 e-mail invitation to a June 9, 2006 meeting for representatives from Capco, Ryder, and UBOC; (2) a July 13, 2006 bill of $2,032.50 for that meeting; and (3) an affidavit, dated August 20, 2010, from Ilyas Chaudhary ("Chaudhary"), the Capco representative, attesting to his recollections of the meeting. As both lower courts held, none of these pieces of evidence indicates that the implied contract established for the June 9, 2006 meeting was for anything more than Ryder's presentation of the report it previously had been retained by Tana to produce. Agreeing with the lower courts, we hold that nothing further agreed between them has been shown.

First, Capco relies on the e-mail from Chaudhary to a Ryder representative advising that Capco had executed the PSA to acquire the

Properties and stating that a potential Capco lender had requested a meeting with Ryder engineers to discuss the Tana and Capco properties. In the e-mail, Chaudhary added that he believed the purpose of the meeting was to determine loan values. There is no indication in the e-mail that Capco was seeking an independent re-evaluation regarding the earlier purchase of the Properties. There is only a straightforward re-routed request from a potential Capco lender to discuss the Tana properties, which were the subjects of a report Ryder previously had been retained to produce for Tana.

Next, Capco relies on an invoice from Ryder to Capco following the meeting "for services rendered in connection with the review of [Capco's] reserves and the Tana acquisition reserves with Union Bank of California." Again, there is no indication Capco contracted Ryder to provide an independent re-evaluation of the Properties regarding closing the transaction.[4] The invoice merely confirms that Ryder presented its pre-existing reports regarding Capco and Tana properties to Capco's potential lender at this one-day meeting.

Finally, Capco relies on Chaudhary's August 20, 2011 affidavit which describes the meeting that took place on June 9, 2006. The affidavit states that Basanko made a detailed presentation regarding the Properties. Chaudhary states also that Basanko reviewed the April 1, 2006 Report in detail and discussed the data underlying the report. With respect to Chaudhary's professional expectation between Capco and Ryder for this meeting, Chaudhary states that "Capco expected to receive the benefit of Ryder Scott's professional services and independent judgment in this planned meeting." Chaudhary

---

[4] Notably, even though Capco requested, and the invoice reflects, discussion of both Capco and Tana properties, Capco asserts that the June 9, 2006 meeting itself was an implied contractual encounter to re-evaluate orally the Tana properties only, not the Capco properties.

further states, albeit using the passive voice, that, "it was made clear that the purpose of the meeting was to assure both Capco and UBOC that proceeding with the contemplated acquisition and financing was a sound decision."

Chaudhary's affidavit extensively describes his and Capco's subjective expectations. Noticeably absent from Chaudhary's affidavit, however, is any indication that Ryder agreed to provide anything beyond a presentation of the April 1, 2006 Report it had prepared for Tana or that Ryder actually provided additional and new information regarding the Properties beyond the scope of the April 1, 2006 Report.[5] Chaudhary's affidavit fails to provide evidence indicating that there was a meeting of the minds with respect to an independent re-evaluation Capco hoped it would receive from Ryder at the meeting. Instead, when asked several times at his deposition whether he had ever asked anyone at Ryder to perform due diligence for Capco in connection with the Tana acquisition, Chaudhary admitted that he had no memory of any such request made to Ryder, either verbally or in writing. Further, Chaudhary never asked McInturff and Basanko "to do anything in terms of evaluating the properties independent from the April 1, 2006 Ryder Scott report" nor did he request "an updated valuation of the properties after the April 1, 2006 report."[6] Moreover,

---

[5] Capco argues that Ryder did, in fact, provide information outside the scope of the April 1, 2006 Report because Ryder was brought in to determine loan values. First, the proposition that an engineering firm would be contracted to provide financial lending advice to a bank is improbable. Second, there is no mention anywhere in Chaudhary's affidavit that Ryder rendered such advice to UBOC at the meeting. Third, it is undisputed that no written assessment, financial or engineering, was generated for firsthand use on June 9, 2006, or later, to memorialize any independent findings offered at the meeting.

[6] This admission is supported by the relatively paltry amount Capco paid for an alleged independent evaluation of the Properties. Capco had previously engaged Ryder to provide an analysis of other properties in December, 2005, and the cost of that evaluation was estimated to be between $25,000 and $35,000, not inclusive of additional travel and other expenses. It

Chaudhary admitted that he was unaware of "McInturff doing anything besides reviewing the April 1, 2006 Report."

These circumstances demonstrate that Capco did not contract for the original evaluation of the Properties, did not contract with Ryder independently to re-evaluate their previous Tana evaluation, and did not contract with Ryder for a new evaluation. These conclusions contradict Capco's present contention that it paid Ryder $2,032.50 for an oral, one-day independent re-evaluation and updated warranty of the accuracy of the figures in the 184-page April 1, 2006 Report. As the courts below held, Capco presents no evidence that Ryder agreed to such a duty.

Capco highlights other portions of Chaudhary's affidavit, arguing that Ryder provided professional services beyond presenting the report by vouching for the credibility of the figures in the April 1, 2006 Report. Specifically, Chaudhary attests that Basanko "indicated that the reserve estimates set forth in the April 1, 2006 report were 'conservative,' explaining that in the event there was any question regarding the characterization of any reserves as 'proved' or 'probable,' Ryder Scott would have characterized such reserves as 'probable.'" Capco claims that because these characterizations were beyond the scope of the report and were unavailable to Capco prior to June 9, 2006, a new contractual relationship was established at the meeting. However, Capco's own expert admitted that Tana's prospectus and the April 1, 2006 Report itself set forth the

---

is incongruous that six months later, Ryder agreed to provide an independent re-analysis of the Properties for $2,032.50. As the bankruptcy judge noted, it "defies reason and experience to assert that Plaintiffs paid $2,000 for an independent evaluation of value in a transaction to pay $83 million for mineral rights." In addition to this implausibility, we note that an opposite conclusion, inferring a professional re-evaluative duty from a presentation of an original analysis, prepared contractually for a different entity, might dissuade authors of professional reports from presenting their reports to anyone other than an original client.

distinction between "proved" and "probable," and represented that the reserve estimates were conservative.[7] Therefore, not only were Basanko's representations within the scope of the April 1, 2006 Report, but such categorizations were already available to Capco before the June 9, 2006 meeting. When comparing the April 1, 2006 Report and the June 9, 2006 presentation, there is no evidence that the presentation embellished the reserves report by giving professional assurances beyond the data.

A further examination of the Chaudhary affidavit confirms that, though descriptive of Chaudhary's expectations, it never describes Ryder's acceptance of a duty to re-evaluate independently the Properties for Capco. To extract such an engagement from Chaudhary's affidavit,[8] Capco is obliged to point selectively to: (1) statements about Capco's expectations that do not contain any assumptions by Ryder of reciprocal obligations; (2) statements uttered after the meeting by a Ryder employee positioning himself for a potential employment opportunity with Capco; and (3) statements which do not confirm a pre-existing contractual agreement, but instead describe the discussion occurring at the meeting itself.

---

[7] According to the "[p]enultimate paragraph of Page 7 of Tana's prospectus and the definition of Unproved reserves included in the April 1st report, 1st paragraph": "Tana et al assured any potential purchaser that Ryder Scott had downgraded any reserves where there could be questionable underlying data, such as uncertainties regarding reservoir limits and ultimate recoveries, to Probable and Possible reserves leaving only those without these uncertainties within the Proved category. This is a representation that the reserve estimates are conservative."

[8] Again, the two-month old report is 184 pages long; a similar engagement between these same parties six months earlier cost Capco between $25,000 and $35,000; and, as the bankruptcy court highlighted, one would have to assume that Capco engaged Ryder for such a consequential re-evaluation of the Properties after executing the PSA and without contemplation of either a written contract or written product from the engagement.

Capco argues that a general professional relationship existed between Capco and Ryder sufficient to confer professional liability on Ryder. It is the specific nature of the professional relationship, however, that determines what duty Ryder owed to Capco. See Fed. Sav. and Loan Ins. Corp., 955 F.2d at 265 ("The duty owed by a professional to his client derives from their contractual relationship . . . ."). Capco's evidence demonstrates only two engagements with Ryder prior to the closing of the acquisition: (1) Capco's earlier, written contract with Ryder to produce the December 31, 2005 Report that was estimated to cost between $25,000 and $35,000, and estimated to take over two months to produce; and (2) Capco's June 4, 2006 e-mail invitation to Ryder to present on June 9, 2006, for $2,032.50, the April 1, 2006 Report that Tana contracted Ryder to produce. By preparing the December 31, 2005 Report for Capco, and then by presenting the contents of the Capco December 31, 2005 Report as well as the Tana April 1, 2006 Report to UBOC, Ryder fulfilled its contractual duties to Capco.[9]

Absent evidence demonstrating a meeting of the minds between Capco and Ryder specifically establishing a duty beyond presenting the contents of the December 31, 2005 Report and the April 1, 2006 Report at one meeting, Capco cannot establish that Ryder owed a duty to Capco independently to re-evaluate the reserves of the Properties with the skill and care commensurate with the requirements of the profession to anyone but Tana, the party who originally

_____

[9] Capco also raises the issue of "whether the Bankruptcy Court erred in finding that the acquisition of the Tana Properties by Capco was completed on June 2, 2006." Because the bankruptcy court's finding does not affect our determination of whether a specific professional relationship existed between Capco and Ryder, we do not address this finding. However, the post-PSA timing of the June 9, 2006 meeting does support the conclusion that this was not an engagement to conduct an independent re-evaluation of the Properties.

contracted it to produce the April 1, 2006 Report.

B. Capco's claims against Tana, TRT, and Tristone

Capco claims that Tana committed actionable fraud when it sent Capco a closing statement on August 28, 2006, in which Tana estimated that the revenue for August would be $6 million. Capco claims that in reliance on this fraudulent representation, Capco proceeded to close the acquisition to its detriment.

Under Texas law, one of the elements of a fraud claim is reliance. Fluorine On Call, Ltd. v. Fluorogas Ltd., 380 F.3d 849, 858 (5th Cir. 2004); Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex. 2001). However, when knowledgeable parties elect to include an unambiguous waiver-of-reliance provision, courts will enforce such provision. See Forest Oil Corp. v. McAllen, 268 S.W.3d 51, 58 (Tex. 2008) (citing Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171, 181 (Tex. 1997)) .

In the instant case, at several points during the transactional process, Capco signed agreements waiving its reliance on representations made by Tana, TRT, and Tristone. In particular, in signing the PSA, Capco specifically accepted Tana's disclaimer of any representation regarding the accuracy of any information "now, heretofore, or hereafter furnished to [Capco] by or on behalf of [Tana]." Furthermore, Capco agreed that in deciding to enter the PSA and consummate the acquisition, Capco "relied solely on the basis of its own independent due diligence investigation of the Assets, upon the representations and warranties made in [the PSA], and not on any other representations or warranties of [Tana] or any other person or entity." Even assuming that Tana's estimate of August revenues was in fact false, the PSA provisions now prevent Capco from asserting reliance on such representation.

15

Capco argues that because Tana allegedly committed fraud in overestimating the August 2006 revenue, the waiver-of-reliance provision is unenforceable. In support of its argument, Capco cites Lyn-Lea Travel Corp. v. Am. Airlines, Inc., 283 F.3d 282, 289 (5th Cir. 2002) in arguing that a fraudulently induced party is not bound by the contract's terms because the fraud vitiates the requisite mutual assent. Legally, Lyn-Lea is distinguishable because the pertinent issue in that case was whether a fraudulent inducement defense is preempted by the Airline Deregulation Act. Id. at 289-90. Capco's argument also fails factually because the representation at issue, even if fraudulent, occurred on August 28, 2006, after the PSA had been signed on June 2, 2006. Therefore, Capco could not fraudulently have been induced to sign the PSA because the alleged fraud had not yet taken place.

Capco also claims that Tana, TRT, and Tristone committed fraud when they "repeatedly invited Capco to rely upon the April 1, 2006 Ryder Scott reserve report" prior to the execution of the PSA. Notwithstanding Capco's characterization of Tana's representations as "invitations to rely,"[10] Capco waived its right to rely on such representations. Where the parties have signed a contract with a clause that expressly disclaims reliance on prior representations, such clause negates a fraudulent inducement claim. See LHC

---

[10] The "invitations to rely" to which Capco refers consist of three e-mail communications. The first is an e-mail from Tristone to Tana, dated April 30, 3006, confirming that, "[a]ll offers should be based on review of the [previously provided] information." The second is an internal Tana e-mail, dated May 25, 2006, informing transaction team members that Capco and Tana had discussed a variance between Tana's actual production and the Ryder report forecast. The e-mail continues that Tana and Tristone explained to Capco that Tana was "right on Ryder Scott's production projection." The third is an e-mail from Tana to Capco, dated May 26, 2006, stating that, "[t]here is no question that we are spot on or ahead of Ryder Scott's production forecast."

Nashua P'ship, Ltd. v. PDNED Sagamore Nashua, L.L.C., 659 F.3d 450, 460 (5th Cir. 2011) (citing and discussing Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am., 341 S.W. 3d 323, 333-37 (Tex. 2011)). Here, not only does the PSA provide that Tana expressly disclaimed any representation of accuracy with respect to previous information provided to Capco, but also Capco specifically represented in the PSA that it had relied solely on its own due diligence investigation and had not relied on any representations made by Tana, TRT, and Tristone. Because the PSA contains a clear intent to disclaim reliance, the lower courts correctly held that Capco is unable to claim fraudulent inducement based on the prior representations of Tana, TRT, and Tristone. See Armstrong v. Am. Home Shield Corp., 333 F.3d 566, 571 (5th Cir. 2003); Forest Oil, 268 S.W.3d at 58-61; Schlumberger Tech. Corp., 959 S.W.2d at 179-80.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

OWEN, Circuit Judge, concurring and dissenting.

I concur in the panel's majority opinion to the extent of its disposition of the issues regarding Tana, TRT, and Tristone. However, I respectfully part company with the disposition of the professional negligence claim that Capco has

asserted against Ryder Scott.

The majority opinion characterizes Capco's contentions narrowly and does not accurately capture the arguments that Capco has asserted in the district court and in this court. The majority opinion significantly contracts Capco's argument by repeatedly stating that Capco is contending that it retained Ryder Scott to conduct "an independent re-evaluation" of the properties it agreed to purchase from Tana. That is not the overarching claim that Capco has made. Capco's Amended Complaint in the bankruptcy court reflects that Capco desired assurances from Ryder Scott that the April 1, 2006 Report prepared for Tana was "accurate, complete, reliable, and compiled in accordance with acceptable industry standards applicable to petroleum engineers." Capco could not rely on its review of that Report as part of the data that Tana furnished because Capco expressly agreed in the purchase and sale agreement that it would not and could not so rely. In order to obtain the assurances that it desired, Capco contracted directly with Ryder Scott to obtain Ryder Scott's professional judgment regarding the April 1, 2006 Report. Capco did not ask Ryder Scott to update the information contained in the April 1, 2006 Report. Capco wanted to hear directly from Ryder Scott that Ryder Scott stood behind that Report and that Capco could rely on it in moving forward to close the transaction with Tana.

Ryder Scott provided what Capco retained it to provide. As Capco alleged in the district court and in its briefing before our court, the principal author of the Ryder Scott Report, Olga Basanko, attended the June 9, 2006 meeting with Capco and its potential lender. Basanko "went over the April 1, 2006 reserve report in detail, and presented a great deal of data underlying that report, including geologic maps, well logs, reports, and similar documents. Ms. Basanko stated that Ryder Scott's reserve estimates reflected in the April 1, 2006

18

[Report], were accurate and reliable. She further stated that Ryder Scott's work was thorough and complete." That this information was provided by Ryder Scott and that these representations were made is undisputed. This is not "an independent re-evaluation" of the Tana properties. This is an undertaking by Ryder Scott to provide its professional opinion to Capco that the April 1, 2006 Report was accurate as of April 1, 2006, and was prepared in accordance with accepted standards. Basanko supported her opinion regarding the accuracy of the Report, as of April 1, 2006, with detailed data. This is precisely the stuff of which a contract for professional services is made. At the risk of unnecessary repetition, the only way that Capco could obtain the professional opinion of Ryder Scott for Capco's direct consumption was to retain Ryder Scott directly. Capco was otherwise foreclosed by the purchase agreement with Tana from relying on Ryder Scott's professional opinions set forth in the April 1, 2006 Report.

The majority opinion's fundamental misunderstanding of Capco's claim is exhibited in the statement that

> not only were Basanko's representations within the scope of the April 1, 2006 Report, but such categorizations were already available to Capco before the June 9, 2006 meeting. When comparing the April 1, 2006 Report and the June 9, 2006 presentation, there is no evidence that the presentation embellished the reserves report giving professional assurances beyond the data.[1]

In signing the purchase and sale agreement on June 2, 2006, Capco had expressly disclaimed reliance on any information that Tana provided regarding the properties that were the subject of the acquisition, including information that Ryder Scott had provided and Ryder Scott's April 1, 2006 Report. At that

---

[1] Ante at 13.

point in time, Capco had no relationship with Ryder Scott regarding the Tana properties and had no recourse against Ryder Scott if the Report was inaccurate. The April 1, 2006 Report was not "available" to Capco as a professional opinion on which it could rely as of June 2, 2006. No "assurances" were given to Ryder Scott by the April 1, 2006 Report as of the June 2, 2006 signing of the purchase and sale agreement because Capco disavowed any such assurances as part of that agreement. The very next day after the June 2, 2006 agreement was signed, Capco contacted the individuals at Ryder Scott with whom it had a pre-existing professional relationship to retain Ryder Scott directly to provide professional services to Capco regarding the Tana properties. Professional services regarding the Tana properties were provided directly to Capco on June 9, 2006, seven days after Capco has signed the purchase and sale agreement.

The majority opinion summarily dismisses the undisputed evidence that other direct, material representations by a Ryder Scott employee were made to Capco regarding the Tana properties after the June 9, 2006 meeting. Shortly after the June 9 meeting, the president of Capco had lunch with Pat McInturff, a Ryder Scott engineer with whom Capco had a pre-existing relationship through the reserve report Ryder Scott had prepared analyzing Capco's reserves. McInturff had been present at the June 6, 2006 meeting and heard Basanko's presentation. At the lunch meeting with McInturff, Capco's president indicated that he was "satisfied with the [Ryder Scott] presentation regarding the Properties," and that Capco was inclined to move forward with the acquisition. McInturff "indicated" to Capco's president "that he believed that was a sound decision." McInturff "made several positive comments . . . regarding the Properties, including statements that he believed they were 'good properties' and that they would be a 'good fit' for Capco." This Ryder Scott employee "also stated

20

that Ryder Scott's estimate of the Properties' proved reserves was conservative and that the Properties had significant 'upside potential.'" The majority opinion sweeps this evidence aside by describing it as "statements uttered after the meeting by a Ryder employee positioning himself for a potential employment opportunity with Capco." Regardless of McInturff's possible personal motivation, he was an employee and agent of Ryder Scott when these statements were made. His statements are some evidence of professional opinions rendered by Ryder Scott within the scope of its engagement by Capco.

Capco's argument is and has consistently been that before it was even aware of the Tana properties, it had a professional relationship with Ryder Scott. Capco retained Ryder Scott to prepare a report of Capco's reserves as of December 31, 2005. Capco felt "comfortable" with asking Ryder Scott directly for its professional opinion regarding the April 1, 2006 Report pertaining to Tana's reserves because of this pre-existing relationship.

Capco alleges that if Ryder Scott had not vouched for the accuracy and reliability of the April 1, 2006 Report, Capco would not have closed the acquisition from Tana. Capco asserts that it had the option of withdrawing from the transaction after it signed the purchase and sale agreement with Tana and before the August 31, 2006 closing, with forfeiture of its 10% deposit as its maximum possible loss. It alleges that its losses from proceeding to close the transaction were far greater.

After the Tana acquisition closed, Capco again retained Ryder Scott in 2007 to prepare a reserve report as of December 31, 2006. Capco alleges that it was this subsequent report that "showed less that [sic] $12 million in PDP reserves [for the properties acquired from Tana], a shocking decline of $35-$40 million, net of interim production." Capco asserts that when it received this

21

report, it discovered that representations made by Tana and Ryder Scott regarding "the Properties' hydrocarbon reserves had been false and grossly overstated."

The principal, though not exclusive, focus of the professional negligence claim is that the April 1, 2006 Report was "riddled with negligence." Capco did not retain Ryder Scott to prepare that report or even to re-evaluate that Report. Capco retained Ryder Scott to vouch for the April 1, 2006 Report and to provide its professional opinion that the report had been prepared without negligence and in accordance with accepted principles. Ryder Scott billed Capco for that opinion, and Capco paid for it.

The majority opinion erects a straw man by again erroneously stating that Capco contends it contracted for an independent re-evaluation of the Tana reserves. The majority opinion then dismantles the straw man in arguing that it is "incongruous" that Ryder Scott would agree "to provide an independent re-analysis of the Properties for $2032.50" when Capco paid Ryder Scott between $25,000 and $35,000 for the report on Capco's reserves as of December 31, 2005.[2] Capco does not contend that it paid Ryder Scott to prepare another, new reserve report regarding the Tana properties. Capco wanted Ryder Scott's professional opinion and judgment regarding the reliability of the work that it had performed for Tana, which was contained in the existing April 1, 2006 Report for which Ryder Scott would have no accountability to Capco absent an agreement to provide professional opinions and judgments regarding that Report to Capco directly.

The only basis on which Ryder Scott sought summary judgment with

---

[2] Ante at 12 n.6.

respect to the professional negligence claim was lack of privity between Capco and Ryder Scott. No one disputes that a contract with Capco existed. Ryder Scott simply disputes the scope of that contract. With great respect to the majority, I cannot fathom how one can conclude that there was no contract for professional services regarding the April 1, 2006 Report and its reliability. For that reason, I must dissent.